UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

STEVE M. TARESKI,

                    Plaintiff,

                                                    Case No. 22-cv-481-pp

        v.

KILOLO KIJAKAZI,

                    Defendant.

## ORDER AFFIRMING FINAL ADMINISTRATIVE DECISION OF COMMISSIONER

On April 20, 2022, the plaintiff filed an appeal seeking review of an administrative law judge's decision that found him not "disabled" within the meaning of the Social Security Act. Dkt. No. 1. The plaintiff did not file written exceptions and the Social Security Administration's Appeals Council did not assume jurisdiction on its own, rendering the administrative law judge's decision the final decision of the Commissioner. The court affirms the Commissioner's decision.

I.      **Procedural History and the ALJ's Decision**

On February 24, 2014, the plaintiff filed a Title II application for a period of disability and disability insurance benefits. The plaintiff alleged a disability onset date of October 18, 2013. The Social Security Administration initially denied the plaintiff's claim on November 4, 2014, and upon reconsideration on June 3, 2015. Dkt. No. 11-10 at 6, 28. The plaintiff requested a hearing before

1

an administrative law judge (ALJ). On February 22, 2017, ALJ Koren Mueller held a hearing.[1] Id. at 28, 35. On May 25, 2017, ALJ Mueller issued an unfavorable decision finding that the plaintiff was not "disabled" as defined in the Social Security Act from October 18, 2013 through the date of the decision and denying benefits. Id. at 34–35. On April 9, 2018, the Appeals Council denied review. Id. at 40.

On June 6, 2018, the plaintiff filed a petition for judicial review of the 2017 decision. Dkt. No. 11-10 at 5–8. On December 27, 2018, District Judge William Griesbach entered an order granting the parties' stipulation for remand, reversing the Commissioner's final administrative decision and remanding. Id. at 13–14, 16. See id. at 17–18 (parties' stipulation). On March 4, 2019, the Appeals Council vacated the final decision of the Commissioner and remanded to an ALJ for further proceedings. Dkt. No. 11-10 at 22–23. On July 9, 2019, ALJ Timothy Malloy held a hearing.[2] Dkt. No. 11-9 at 5, 27. On September 26, 2019, ALJ Malloy issued an unfavorable decision finding that the plaintiff was not "disabled" as defined in the Social Security Act from October 18, 2013, through the date of the decision and denying benefits. Id. at 5–19. On January 23, 2020, the plaintiff filed a petition for review of the 2019 decision. Id. at 28.

---

[1] The plaintiff was represented by Attorney Thomas Newlin. Dkt. No. 11-10 at 28.

[2] The plaintiff was represented by Attorneys Frederick J. Daley, Jr. and Meredith Marcus. Dkt. No. 11-9 at 5.

On March 16, 2021, District Judge J.P. Stadtmueller reversed and remanded the case. Dkt. No. 11-16 at 54. On June 24, 2021, the Appeals Council vacated the final decision of the Commissioner and remanded to the ALJ. Id. at 55–57. The Appeals Council also noted that on November 4, 2019, the plaintiff had filed a subsequent claim for Title II disability benefits, but that the Appeals Council's action remanding the current claim "render[ed] the subsequent claim duplicate." Id. at 57. The Appeals Council thus instructed the ALJ to "consolidate the claims files, associate the evidence, and issue a new decision on the consolidated claims." Id. (citing 20 CFR §404.952 and HALLEX I-1-10-10). The Appeals Council also stated that on remand, the ALJ "should apply the prior rules to the consolidated case pursuant to HALLEX I-5-3-30." Id.

On December 29, 2021,[3] the plaintiff appeared at a telephone hearing[4] before ALJ Wayne Ritter. Dkt. No. 11-15 at 37. The plaintiff was represented by Attorneys Frederick J. Daley, Jr. and Meredith Marcus, and Attorney Marcus appeared at the hearing. Id. Both the plaintiff and vocational expert (VE) Sherry Ronning testified. Id. On February 7, 2022, ALJ Ritter issued an unfavorable decision finding that the plaintiff was not "disabled" as defined by the Social

---

[3] The ALJ's decision noted that a hearing initially was held on September 21, 2021, but that "technical issues resulted in the lack of an official recording." Dkt. No. 11-15 at 5 n.1.

[4] The hearing was held via telephone "due to the extraordinary circumstance presented by the Coronavirus Disease 2019 (COVID-19) Pandemic." Dkt. No. 11-15 at 5. "All participants attended the hearing by telephone" and "the claimant agreed to appear by telephone before the hearing (see Exh. 50B), and confirmed such agreement at the start of the hearing." Id.

Security Act "at any time from October 18, 2013, the alleged onset date, through June 30, 2020, the date last insured," and denying benefits. Id. at 24–25. See id. at 6 (finding that the plaintiff's earnings record showed that the plaintiff had "acquired sufficient quarters of coverage to remain insured through June 30, 2020"). ALJ Ritter found that the plaintiff—born February 6, 1966—was forty-seven years old as of the alleged disability onset date, fifty-four years old on the date last insured and had obtained a bachelor's degree. Id. at 13, 23. The ALJ observed that the plaintiff "worked full time as a housing program assistant from February 1996 through October 2012, which [the plaintiff] described as 'primarily data entry.'" Id. at 13 (citing Dkt. Nos. 11-7 at 3–5; 11-8 at 83). See id. at 23 (citing the VE's classification of this past relevant work as an "eligibility and occupancy interviewer").

In evaluating a claim for disability benefits, the ALJ must follow a five-step, sequential process. Apke v. Saul, 817 F. App'x 252, 255 (7th Cir. 2020). The following chart summarizes the ALJ's findings at each step:

| STEP | FINDINGS |
|---|---|
| Step One: Is the claimant engaged in substantial gainful activity? | The claimant did not engage in substantial gainful activity during the period from his alleged onset date of October 18, 2013 through his date last insured of June 30, 2020. |
| Step Two: Is the impairment or combination of impairments severe— does it significantly limit the claimant's mental or | Through the date last insured, the claimant had the following severe impairments: history of 1987 aneurism, status post craniotomy; seizure disorder; and migraines. |

4

| | |
|---|---|
| physical ability to do basic work activities? | |
| Step Three: Does the impairment meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity?<br><br>If yes, disabled.<br>If no, move to step four. | Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. |
| Step Four: Does the claimant's residual functional capacity allow the claimant to perform past relevant work? | The claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; frequently balance and crawl; occasionally push and pull with the bilateral upper extremities; frequently handle and finger with the left (non-dominant) upper extremity; and must avoid all exposure to unprotected heights, hazards, and use of dangerous moving machinery.<br><br>Through the date last insured, the claimant was capable of performing past relevant work as an eligibility and occupancy interviewer. This work did not require the performance of work related activities precluded by the claimant's residual functional capacity. |
| Step Five: Can the claimant perform any other work existing in significant | In the alternative, there were other jobs that existed in significant numbers in the national economy |

Case 2:22-cv-00481-PP   Filed 07/18/23   Page 5 of 73   Document 26

| numbers in the national economy? | that the claimant also could have performed: office helper, rental clerk, mail clerk. |
|---|---|

See Dkt. No. 11-15 at 7, 8, 12, 13, 22, 23–24.[5]

The ALJ concluded that the plaintiff "was not under a disability, as defined in the Social Security Act, at any time from October 18, 2013, the alleged onset date, through June 30, 2020, the date last insured." Id. at 24 (citing 20 CFR §404.1520(g)). The plaintiff did not file written exceptions and the Appeals Council did not assume jurisdiction on its own, making ALJ Ritter's decision the agency's final decision for purposes of judicial review. Dkt. No. 19 at 3; 20 C.F.R. §404.984.

On April 20, 2022, the plaintiff appealed, seeking this court's review of ALJ Ritter's February 7, 2022 decision. Dkt. No. 1. The plaintiff asks the court to reverse the ALJ's decision and remand the case under sentence four of 42 U.S.C. §405(g). Dkt. No. 12 at 29. Alternatively, the plaintiff asks the court to reverse the ALJ's decision, and to "step in and award benefits," id., arguing that "this is a case where an award of benefits is appropriate," dkt. no. 22 at 15. On July 13, 2023, after the parties had fully briefed the issues, dkt. nos. 12, 19, 22, the court held a hearing. Dkt. No. 25 (hearing audio). The court advised the parties that it had reviewed the briefs and the arguments and that

---

[5] The claimant bears the burden of proof at steps one through four; at step five, the burden shifts to the Commissioner. Ghiselli v. Colvin, 837 F.3d 771, 776 (7th Cir. 2016) (citing Butera v. Apfel, 173 F.3d 1049, 1054 (7th Cir. 1999)).

6

it was affirming the ALJ's decision; the court informed the parties that it would be issuing a written decision, but briefly summarized what the parties could anticipate in that decision. Id.

## II.  Standard of Review:

Section 405(g) of Title 42 limits the court's review; the district court must uphold the decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. §405(g); Jelinek v. Astrue, 662 F.3d 805, 811 (7th Cir. 2011). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009) (citation omitted). Courts have defined substantial evidence as "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." Schaaf v. Astrue, 602 F.3d 869, 874 (7th Cir. 2010). A decision denying benefits need not discuss every piece of evidence; remand is appropriate, however, when an ALJ fails to provide adequate support for the conclusions drawn. Jelinek, 662 F.3d at 811. If conflicting evidence in the record would allow reasonable minds to disagree about whether the plaintiff is disabled, the ALJ's decision to deny the application for benefits must be affirmed if the decision is adequately supported. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).

The district court must review the entire record, including both evidence that supports the ALJ's conclusions and evidence that detracts from the ALJ's conclusions, but it may not "displace the ALJ's judgment by reconsidering facts

Case 2:22-cv-00481-PP   Filed 07/18/23   Page 7 of 73   Document 26

or evidence, or by making independent credibility determinations." Id. "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." Biestek v. Berryhill, ___ U.S. ___, 139 S. Ct. 1148, 1154 (2019). Judicial review is limited to the rationales offered by the ALJ. Shauger v. Astrue, 675 F.3d 690, 697 (7th Cir. 2012) (citing SEC v. Chenery Corp., 318 U.S. 80, 93–95 (1943)). The ALJ must follow the Social Security Administration's rulings and regulations in making a determination. Failure to do so requires reversal unless the error is harmless. See Prochaska v. Barnhart, 454 F.3d 731, 736–37 (7th Cir. 2006). A reviewing court does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." Burmester v. Berryhill, 920 F.3d 507, 510 (7th Cir. 2019) (quoting Lopez ex rel. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003)). The district court will uphold a decision so long as the record reasonably supports it and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review. Eichstadt v. Astrue, 534 F.3d 663, 665–66 (7th Cir. 2008).

III.   **Analysis**

The plaintiff argues that the ALJ erred in two ways: (1) in his subjective symptom analysis and (2) in his evaluation of the opinion evidence.

A.   ALJ's Subjective Symptom Analysis

The plaintiff first argues that the ALJ erred in his subjective symptom analysis and conclusion that the plaintiff's statements about the intensity,

persistence and limiting effect of his symptoms were "not entirely consistent" with the objective record. Dkt. No. 12 at 10 (citing Dkt. No. 11-15 at 14).

The plaintiff begins with a sentence implying that the ALJ did not apply the appropriate standard in evaluating the plaintiff's subjective symptoms: "The correct standard is less rigorous: whether the allegations 'can reasonably be accepted as consistent with the objective medical evidence and other evidence.'" Id. at 11 (citing 20 C.F.R. §§404.1529(a), 404.1529(c)(4); Minger v. Berryhill, 307 F. Supp. 3d 865, 871 (N.D. Ill. 2018)). The plaintiff does not provide any further argument, nor does the plaintiff appear to assert that this alleged error independently requires remand. To the extent that the plaintiff argues the ALJ applied an improper standard, the court will not remand solely on this basis. The Seventh Circuit has referred to phrases like "not entirely consistent" and "not entirely credible" as "meaningless boilerplate." Fanta v. Saul, 848 F. App'x 655, 659 (7th Cir. 2021); Schomas v. Colvin, 732 F.3d 702, 708 (7th Cir. 2013); Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2013); Parker v. Astrue, 597 F.3d 920, 922 (7th Cir. 2010). The Seventh Circuit has explained, however, that "[t]he use of [such] boilerplate is innocuous when . . . the language is followed by an explanation for rejecting the claimant's testimony." Fanta, 848 F. App'x at 659 (quoting Schomas, 732 F.3d at 708). A court must evaluate an ALJ's decision and analysis to determine whether the ALJ identified sufficient reasons to reject or attribute little weight to the claimant's testimony and subjective symptoms. Fanta, 848 F. App'x at 659–60.

9

The regulations define "symptom" as a claimant's "own description of [his or her] physical or mental impairment." 20 C.F.R. §§404.1502(i) and 416.902. ALJs follow a two-step process to evaluate a claimant's subjective symptoms and complete a credibility determination. Apke, 817 F. App'x at 257 (citing 20 C.F.R. §§404.1529(a), 416.929(a)). First, the ALJ considers whether the claimant's impairments could reasonably be expected to produce the symptoms he alleges. Id. (citing 20 C.F.R. §§404.1529(b), 416.929(b)). Second, the ALJ considers whether the record supports the severity of the symptoms the claimant alleges. Id. (citing 20 C.F.R. §§404.1529(c), 416.929(c)). In completing this second step, "Social Security Ruling 16-3p explains factors to consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms." Wilder v. Kijakazi, 22 F.4th 644, 653 (7th Cir. 2022) (citing SSR 16-3p, 2017 WL 5180304; 20 C.F.R. §404.1529). See also Gedatus v. Saul, 994 F.3d 893, 903–04 (7th Cir. 2021) (running through the regulatory factors in 20 C.F.R. §404.1529(c)(3)). This includes consideration of "the claimant's reported activity levels and treatment received." Apke, 817 F. App'x at 257.

"When assessing an ALJ's credibility determination," the court must "merely examine whether the ALJ's determination was reasoned and supported." Elder, 529 F.3d at 413 (citations omitted). "So long as an ALJ gives specific reasons supported by the record, [the court] will not overturn his credibility determination unless it is patently wrong." Deborah M. v. Saul, 994 F.3d 785, 789 (7th Cir. 2021) (quoting Curvin v. Colvin, 778 F.3d 645, 651 (7th Cir. 2015)). See also Elder, 529 F.3d at 413–14 ("It is only when the ALJ's

determination lacks any explanation or support that we will declare it to be 'patently wrong' . . . and deserving of reversal.") (cleaned up); Skarbek v. Barnhart, 390 F.3d 500, 505 (7th Cir. 2004) ("This court will affirm a credibility determination as long as the ALJ gives specific reasons that are supported by the record for his finding."). "A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence." Cullinan v. Berryhill, 878 F.3d 598, 603 (7th Cir. 2017) (citation omitted). The "deferential standard of review is weighted in favor of upholding the ALJ's decision . . . ." Moon v. Colvin, 763 F.3d 718, 721 (7th Cir. 2014). SSR 16-3p also provides specific instructions for ALJs in articulating their subjective symptom analysis: "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

    1.    *Objective Evidence*

        a.     Upper Extremities

The plaintiff begins with the ALJ's analysis of his alleged upper extremities symptoms and limitations. Dkt. No. 12 at 11–13. The plaintiff first observes that in the 2021[6] decision remanding the case, Judge Stadtmueller noted that "there remain[ed] large swaths of the medical record which the ALJ

---

[6] The plaintiff refers to "the 2020 decision," dkt. no. 12 at 11, but the decision he quotes was issued in 2021. See Dkt. No. 11-16 at 54.

11

either discounted or flatly did not discuss when assessing Plaintiff's subjective symptoms." Id. at 11 (quoting Dkt. No. 11-16 at 47). The plaintiff then highlights portions of the record reflecting issues with his upper extremities, most of which contain notes from physical exams conducted by Drs. Golden and Schneider, as well as the plaintiff's report that he was unable to lift a gallon of milk on the left, could grasp coins with some difficulty and could not write accurately. Id. at 11–12 (citing Dkt. Nos. 11-8 at 9, 10, 22, 59, 85, 204–06; 11-14 at 116, 167, 182; 11-44 at 2; 11-48 at 13). The plaintiff argues that an ALJ may not ignore an entire line of evidence that undermines his conclusions or is contrary to his ruling. Id. at 12 (citing Arnett v. Astrue, 676 F.3d 586, 592 (7th Cir. 2012); Reinaas v. Saul, 953 F.3d 461, 467 (7th Cir. 2020)). The plaintiff indicates that although the ALJ noted the plaintiff's statements at a September 2013 exam that he was improving after not working for almost a year, dkt. no. 11-15 at 16, that same record also "notes that despite ceasing work, if he did anything repetitive it would cause him pain and while rest improved the pain, his pain would never resolve." Dkt. No. 12 at 12 (citing Dkt. No. 11-8 at 18). But the ALJ explicitly included this portion, stating that the plaintiff "continued to experience pain with repetitive right-hand use." Dkt. No. 11-15 at 16. The ALJ continued discussing this September 2013 exam, acknowledging that the objective results of the physical exam found the plaintiff "had tenderness at the right thumb with range of motion, as well as pain with supination and pronation of the right hand." Id. (citing Dkt. No. 11-8 at 19).

12

The plaintiff then asserts that the ALJ omitted the plaintiff's reported symptoms at the following visit: "At the next visit, the ALJ omits that [the plaintiff] reported severe pain in the right hand when he did any activity and the left hand was chronic as well. He denied numbness and tingling until he performed repetitive movements. Swelling had resolved with avoiding the repetitive hand motions." Dkt. No. 12 at 12 (citing Dkt. Nos. 11-8 at 21, 11-15 at 16). But again, the ALJ *did* consider the records of this visit and summarized the objective findings: "December 2013 primary care examination noted decreased (4/5) left upper and lower extremity strength with active testing, weakened right hand grip, and pain with supination and pronation of the right hand (Exh. 1F/21). He was again advised to continue with home exercise (Exh. 1F/21)." Dkt. No. 11-15 at 16 (citing Dkt. No. 11-8 at 22). The plaintiff points to records showing that his fine finger movements were significantly impaired. Dkt. No. 12 at 12 (citing Dkt. No. 11-20 at 303). The ALJ included these records in the decision as well, explicitly stating that "February 2019 neurology notes document[ed] mild tremulousness of the left hand with significantly impaired fine finger movements." Dkt. No. 11-15 at 17 (citing Dkt. No. 11-20 at 303).[7]

According to the plaintiff, this "long line of objective evidence" supports greater hand restrictions and the ALJ's decision did not address "some of it." Dkt. No. 12 at 12. But "an ALJ's adequate discussion of the issues need not

---

[7] The plaintiff and the ALJ cite to different exhibits in the record, but they are the same page of notes from the February 11, 2019 visit with Dr. Schneider. Compare Dkt. Nos. 11-20 at 303 with 11-44 at 2.

contain a complete written evaluation of every piece of evidence." Pepper, 712 F.3d at 362. And as the court has observed, most, if not all, of the records to which the plaintiff cites *were* included in the ALJ's decision.

The plaintiff next criticizes the ALJ for pointing "intermittently to normal examinations," but ignoring that these appointments were "related to well man visits, general health concerns, weight loss, HAs and medication," as well as migraines and seizures. Dkt. No. 12 at 12–13. Quoting a Seventh Circuit case from 1995, the plaintiff asserts that "there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression." Id. at 13 (quoting Wilder v. Chater, 64 F.3d 335, 337 (7th Cir. 1995)). The ALJ, however, did not refer to these records as evidence of a doctor diagnosing a condition or impairment; the ALJ cited the physical examination findings observed by the provider and recorded at these visits. The plaintiff's citation to Wilder misses the mark; that case involved the distinction between medical providers who are qualified to identify and diagnose *physical* impairments versus *mental* impairments. See id. (stating that "doctors who are not psychiatrists are slow to diagnose a mental illness, such as depression, that is not manifested in wild behavior"); ("The medical records were of purely physical ailments for which Wilder had sought help, and there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression."). And as the Commissioner points out, the plaintiff repeatedly points to notes from these primary care visits in support of his position.

14

The plaintiff also asserts that the ALJ erred in citing a May 2020 visit, noting "equal movement/use of the upper extremities" because it "was a telephone visit so it is unclear what physical examination actually occurred or how a telephone visit . . . garnishes more weight than those where physical examination occurred." Dkt. No. 12 at 13 (citing Dkt. No. 11-15 at 17). This is not entirely correct; the notes document that this was a *video* appointment. See Dkt. No. 11-20 at 403–04 (repeatedly stating "video visit"). The ALJ cited only the findings from this visit that Dr. Schneider was able to observe and evaluate, namely, that the plaintiff exhibited "equal movement/use of the upper extremities, and fine finger movements bilaterally." Dkt. No. 11-15 at 17 (ALJ's decision), 11-20 at 404 (visit notes). Dr. Schneider was careful to note which portions of the physical examination she was unable to evaluate because it was a video call; there is no reason to believe that the observations Dr. Schneider *did* make were inaccurate. See Dkt. No. 11-20 at 403–04 (noting "unable to examine – video visit" for several elements of the exam, including that Dr. Schneider was "unable to examine" the plaintiff's motor tone or reflexes because it was a "video visit").

Later in his brief, the plaintiff argues that the ALJ's "failure to distinguish [between the plaintiff's] left and right hand limitations [was] pervasive throughout the decision" and that it is "entirely unclear" why the ALJ "rejected any restriction of the left upper extremity." Dkt. No. 12 at 18. The plaintiff asserts that the ALJ did not differentiate between his right and left sides, but rather focused on his right upper extremity issues and did not

15

explain why he avoided any left upper extremity restrictions. Id. at 17–18 (citing Dkt. No. 11-15 at 18). The plaintiff summarizes evidence in the record demonstrating left upper extremity issues and restrictions. Id. at 18 (citing Dkt. Nos. 11-8 at 9, 22, 44–45, 204–06; 11-14 at 5, 116, 167, 182; 11-20 at 62, 303, 365; 11-48 at 42–46). The plaintiff asserts that the ALJ failed "to explain how the significant findings to the left hand, even if they were fluctuating, were accommodated in the RFC or why they were excluded other than simply stating there were varying degrees of deficits in this record." Id.

The court does not agree that the ALJ ignored evidence in the record relating to the plaintiff's left upper extremity or failed to accommodate the left upper extremity in the RFC. The ALJ repeatedly referred to the plaintiff's "mild left-sided hemiparesis [one-sided muscle weakness]," dkt. no. 11-15 at 14, 15, 16, 18, and discussed the plaintiff's left upper extremity issues, id. at 14 (acknowledging plaintiff's testimony that he "has weakness in his left upper extremity and is unable to hold more than a small object"), 16 (noting the plaintiff's primary care provider "indicated that the claimant's left-sided upper and lower extremity strength was slightly reduced to 4/5, as compared to the right" but "the claimant's left-side muscle strength was 'okay'"), 17 (stating "February 2019 neurology notes document[ed] mild tremulousness of the left hand with significantly impaired fine finger movements, but muscle tone and strength (5/5) in all extremities"). Throughout the decision, the ALJ described the symptoms, findings and restrictions as right, left or bilateral. See, e.g., Dkt. No. 11-15 at 15 (noting the plaintiff reported "increased *right* hand pain with

16

repetitive use in 2012 and 2013" and that the record reflected "his *left* hand remained stable, albeit with lack of coordination and inability to use with fine motor skills" and "a diagnosis of *right* index finger tendinitis"), 16 (stating a "December 2013 primary care examination noted decreased (4/5) *left* upper and lower extremity strength with active testing, weakened *right* hand grip, and pain with supination and pronation of the *right* hand"), 16 (stating that the 2014 consultative examiner noted the plaintiff "had full *bilateral* upper extremity strength, including grip strength, and was to perform finger-to-nose with rapid alternating movements"), 16 (finding it notable that at the May 2015 consultative exam, the plaintiff "reported having 'some weakness' in the *left* hand, but no problems in the *right* (dominant) hand"), 17 (stating that "January 2020 primary care notes document[ed] findings of decreased upper extremity strength of 3/5 on the *right* and 4/5 on the *left*").

Nor does the court agree with the plaintiff's contention that the ALJ "rejected any restriction of the left upper extremity." The ALJ explicitly included a limitation in the RFC that the plaintiff can only "*frequently* handle and finger with the *left* (non-dominant) upper extremity." Dkt. No. 11-15 at 13 (emphases added). "Frequently" is a restriction; the regulations define it as "occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251, at *6. Drs. Young and Khorshidi, whose opinions the ALJ afforded "significant weight," opined that the plaintiff should be limited to "frequent (as opposed to constant) handling and fingering with the left hand." Dkt. No. 11-15 at 20.

17

Finally, the plaintiff argues that although the ALJ relied on the 2014 and 2015 consultative exams, "both are problematic." Dkt. No. 12 at 13, 17. <u>See</u> Dkt. No. 11-8 at 59–61 (2014 exam), 78–80 (2015 exam). The plaintiff asserts that the 2015 exam is "problematic" because "it is clear that no testing was done to the upper extremity, relevant to the hand and finger limitations in this case. Testing was instead performed to the lower extremity." Dkt. No. 12 at 13 (citing Dkt. Nos. 11-8 at 79–80; 11-15 at 16). It is not clear how this observation demonstrates that the 2015 exam was "problematic" or how the purpose of the exam weakens the examiner's findings. The plaintiff then contends that the 2014 exam is contrary to the 2015 exam and the record. <u>Id.</u> The plaintiff states that the 2014 exam found "no issues with the left side despite the 2015 CE noting left-sided hemiparesis consistent with other reports in the record," and that the 2014 exam found "no issues with gait despite the 2015 CE and later records of positive Romberg testing."[8] <u>Id.</u> (citing Dkt. Nos. 11-8 at 60, 79–80, 204–06; 11-14 at 116, 182; 11-20 at 197, 303).

The ALJ did not exclusively rely on either the 2014 or the 2015 consultative exam, but rather included them in his lengthy discussion of all the objective evidence in the record. His recounting of those exams was not error.

---

[8] A Romberg test is a physical test used to determine whether a patient has "balance problems that are related to proprioception—your body's ability to sense your movements and position." The test requires a patience to stand, feet together with his arms at his sides or crossed in front of him, first with eyes open and then with eyes closed. The treating professional observes for any signs of imbalance, such as swaying. https://my.clevelandclinic.org/health/diagnostics/22901-romberg-test.

18

b.    Lower Extremities

Next, the plaintiff argues that the ALJ also "rejected any evidence" of the plaintiff's issues with his ability to stand and walk. Dkt. No. 12 at 15 (citing Dkt. No. 11-15 at 15). The plaintiff criticizes the ALJ for relying on the 2014 consultative exam, the fact that the plaintiff rode his bicycle and his volunteer work. Id. The court will address the ALJ's consideration of the plaintiff's activities in the next section.

The plaintiff renews his issue with the 2014 consultative exam, asserting that it is inconsistent with the record confirming dysmetria to the left side. Id. (citing the 2015 consultative exam and the reports of Drs. Golden and Schneider). As to the plaintiff's lower extremities, the ALJ observed that at the 2014 consultative exam, the plaintiff "reported being able to walk one mile without difficulty and stand with no restrictions," and the "[p]hysical examination revealed 5/5 strength in the bilateral lower extremities and normal gait," that the plaintiff "had no truncal ataxia and was able to arise from a chair, get on and off the examining table on his own, and tandem walk." Dkt. No. 11-15 at 14–15 (citing Dkt. No. 11-8 at 59–61).

But this was not the only objective evidence the ALJ relied upon in assessing the plaintiff's lower extremity impairments. The ALJ summarized Dr. Golden's physical exam findings from an April 2014 visit, in which the doctor found that the plaintiff "had intact cranial nerve function, full (5/5) motor strength, intact sensation, and while it was noted he is not able to balance on a treadmill for a stress test, his coordination and gait were 'within normal

19

limits.'" Id. at 14 (citing Dkt. No. 11-8 at 29). The ALJ continued, noting "similarly unremarkable" *and* abnormal findings from the May 2015 consultative exam:

> At that time, the claimant reported low back pain that started initially after his aneurysm and had gotten gradually worse. He stated that he could stand for only a "few minutes," walk up to a "couple of blocks," and lift up to 20 pounds. Physical examination was remarkable for spasm and tenderness in the lumbar paraspinal muscles with limited range of movement. Dr. Fareed also noted that the claimant was unable to walk on his heels and toes but did not carry any devices for ambulation and had only "very mild" left-sided hemiparesis with "mildly hemiplegic" gait.

Id. (citing Dkt. No. 11-8 at 78–80). And the ALJ acknowledged that "consistent with these observations," a neuropsychological evaluation report from January 2015 indicated that the plaintiff "was noted to have a slight gait deficit, which was not noticeable unless carefully observed." Id. (citing Dkt. No. 11-8 at 83). The ALJ's decision continued with a summary of the neurology examinations in the record that "noted some issues with balance and gait." Id.

The plaintiff asserts that the ALJ's analysis of the objective records relating to his lower extremity impairments is "likely suspect." Dkt. No. 12 at 16. The plaintiff contends that the ALJ improperly "ma[de] much again of a telephone visit but clearly no physical examination was performed." Id. at 16–17 (citing Dkt. No. 11-15 at 17). The plaintiff cites to the incorrect page of the ALJ's decision (the cited page does not discuss *lower* extremity impairments) and does not provide a cite to this telephone visit in the record. If the plaintiff refers to the May 2020 video visit, then the court has explained that the ALJ did not err in considering the physical findings that the provider was able to

20

observe. Yet the court also notes that the ALJ did not cite or refer to the May 2020 video visit in discussing the plaintiff's lower extremities. See Dkt. No. 11-15 at 14–15. It is not clear what the plaintiff is referring to.

In the decision, the ALJ noted Dr. Schneider's examination of the plaintiff's lower extremities at a May 2019 visit and findings that the plaintiff exhibited "normal strength in all four extremities, and normal gait." Dkt. No. 11-15 at 17 (citing Dkt. No. 11-14 at 30). The plaintiff asserts that although the ALJ observed that this May 2019 visit yielded normal physical exam findings, "visits during the same time period note [Dr. Schneider] observed positive Romberg, inability to tandem walk and wide based gait." Dkt. No. 12 at 17 (citing Dkt. Nos. 11-20 at 303; 11-44 at 2). The plaintiff cites two different parts of the record that contain the same document: Dr. Schneider's notes and physical examination findings from a February 11, 2019 visit. And the ALJ's decision did not ignore these findings. Rather, the ALJ explicitly stated that "[u]pon clinical examination" during the February 2019 visit, the plaintiff "again" exhibited "positive Romberg test and inability to tandem walk." Dkt. No. 11-15 at 15 (citing Dkt. No. 11-44 at 2). Throughout the ALJ's discussion of the opinion evidence and consideration of whether an opinion was "consistent with the overall evidence," the ALJ consistently acknowledged and referred to the plaintiff's "intermittent positive Romberg test and inability to tandem walk . . . ." Dkt. No. 11-15 at 20–21.

The plaintiff also points out that in 2021, Dr. Schneider "wrote of gait instability, likely multifactorial with neurological examinations consistent with

21

hemiparesis." Dkt. No. 12 at 17 (citing Dkt. No. 11-48 at 85). But the ALJ cited these 2021 records, stating that "resulting from the claimant's history of 1987 aneurism, status post craniotomy is mild leftsided hemiparesis." Dkt. No. 11-15 at 14 (citing Dkt. No. 11-48 at 82–85). The same record to which the plaintiff cites includes Dr. Schneider's physical exam findings noting "left hemiparesis, mild," "strength is 5 out of 5 with all movements of all 4 extremities," no tremor, no involuntary movement and a "normal and narrow based" gait. Dkt. No. 11-48 at 84. And the ALJ's decision discussed the gait deficits resulting from this hemiparesis:

> At a May 2015 consultative medical examination conducted by Mohammad Fareed, MD, his examination was similarly unremarkable (Exh. 8F). At that time, the claimant reported low back pain that started initially after his aneurysm and had gotten gradually worse. He stated that he could stand for only a "few minutes," walk up to a "couple of blocks," and lift up to 20 pounds. Physical examination was remarkable for spasm and tenderness in the lumbar paraspinal muscles with limited range of movement. Dr. Fareed also noted that the claimant was unable to walk on his heels and toes but did not carry any devices for ambulation and had only "very mild" left-sided hemiparesis with "mildly hemiplegic" gait (Exhibit 8F). Consistent with these observations, January 2016 neuropsychological evaluation report indicates that the claimant was noted to have a slight gait deficit, which was not noticeable unless carefully observed (Exh. 10F/2).

Dkt. No. 11-15 at 15 (citing Dkt. No. 11-8 at 78–80, 83). The ALJ found that the plaintiff's medical records documented left-sided hemiparesis resulting in, among other things, "varying degrees of deficits in . . . left lower extremity strength, and gait," as well as "intermittent abnormalities in strength, coordination, and balance." Id. at 18.

22

The plaintiff also criticizes the ALJ's reference to portions of the record indicating that the plaintiff's "examinations remain stable." Dkt. No. 12 at 17. The plaintiff points out that Judge Stadtmueller's March 16, 2021 remand order noted that Dr. Schneider used the term "stable" "throughout her opinions to mean that symptoms have neither worsened nor improved—not that Plaintiff's gait was stable, as in steady on his feet." Id. (quoting Dkt. No. 11-16 at 49 n.3). The plaintiff appears to imply that the ALJ improperly relied on the physicians' use of the word "stable." However, the plaintiff cites a page of the ALJ's decision discussing the plaintiff's *upper* extremities and manipulative limitations. Id. (citing Dkt. No. 11-15 at 17). There, the ALJ stated that Dr. Schneider noted the plaintiff "has significant residual deficits of his 1987 aneurism and that his examination remains stable." Dkt. No. 11-15 at 17. See Dkt. No. 11-44 at 2 (Dr. Schneider's notes from February 2019 exam stating, "History of AVM and aneurysm s/p craniotomy in 1987. He has significant residual deficits of mid left cranial nerve palsies, left upper extremity dysmetria and gait ataxia. Examination remains stable."); 11-8 at 205 (same wording in Dr. Schneider's notes from July 2016 exam). See also Dkt. No. 11-15 at 17 (discussing the plaintiff's headaches and noting "[t]hese findings remained stable in neurology follow-ups with Dr. Schneider through February 2019"). But the ALJ continued with summaries of the specific findings made by Dr. Schneider during subsequent physical exams:

> Of note, at a May 8, 2019 neurology visit with Dr. Schneider, the claimant's physical examination was largely unremarkable with normal strength in all four extremities, and normal gait, though fine finger movements were slow on the left (Exhibit 17F). While January

23

2020 primary care notes document findings of decreased upper extremity strength of 3/5 on the right and 4/5 on the left, the claimant retained full range of motion and at a May 2020 neurology telephone visit was observed to have equal movement/use of the upper extremities, and fine finger movements bilaterally (Exh. 29F/7; 31F/41).

Dkt. No. 11-15 at 17 (citing Dkt. Nos. 11-14 at 30; 11-20 at 404; 11-30 at 5). The ALJ did not rely solely on an observation that "exams remained stable."

As to the plaintiff's *lower* extremities, the ALJ's decision does use the word "stable" in summarizing the neurology exams showing "some issues with balance and gait." Dkt. No. 11-15 at 15. Two of these uses potentially refer to physical findings that the plaintiff's gait was stable, as in steady on his feet. The ALJ noted that a July 2016 exam found the plaintiff had a "stable, wide-based gait." Id. (citing Dkt. No. 11-8 at 204–06). Those notes in the record do state that the plaintiff reported a stable gait: "Overall he feels his gait is stable. It has not gotten any worse since his last visit. He has had no falls." Dkt. No. 11-8 at 204. This wording could refer either to "stable" as in "no worse, no better" or "stable" as in "steady." But the rest of the ALJ's summary of that July 2016 exam is correct: positive Romberg, inability to tandem walk, full (5/5) strength in all extremities with intact sensation and wide-based gait. Dkt. Nos. 11-15 at 15; 11-8 at 205.

The ALJ also summarizes a February 2019 clinical examination that revealed the same findings: "positive Romberg test and inability to tandem walk, but retained full (5/5) strength, normal muscle tone in all extremities, and stable wide-based gait." Dkt. No. 11-15 at 15 (citing Dkt. No. 11-44 at 2). These notes do not mention "stable" to describe the plaintiff's gait. See Dkt.

24

Nos. 11-43 at 4–5, 11-44 at 2–4. However, the rest of the findings are correct. Dkt. No. 11-44 at 2.

The ALJ stated that "February 2019 neurology notes indicate[d] that the claimant's left-sided deficits have been 'stable since onset.'" Dkt. No. 11-15 at 15 (quoting Dkt. No. 11-43 at 5). The notes from Dr. Schneider that the ALJ quoted state the following: "To review his history, in 1987 he had both an AVM and aneurysm in the left posterior hemisphere requiring craniotomy. He was left with difficulty with coordination in his left hemibody since that time. Deficits have been stable since onset." Dkt. No. 11-43 at 5. The court does not agree with the plaintiff's characterization that the ALJ "relied on neurological evaluations being 'stable.'" Dkt. No. 22 at 9. The ALJ accurately quoted from and cited these notes as part of his overall summary and discussion of the medical record. The ALJ's decision did not place any particular emphasis on them or attribute any particular significance on them. To the extent that the ALJ "misstated the records" (Dkt. No. 22 at 9) by adding "stable" as an adjective to describe the plaintiff's "wide-based gait," that error—if it was an error—was harmless and the ALJ's assessment of the plaintiff's lower extremities would not change on remand.

> c.      Conclusion: ALJ's Consideration of Objective Evidence

The plaintiff repeatedly criticizes the ALJ for failing to consider "long lines" of evidence, but most, if not all, of the evidence the plaintiff cites *was* included in the ALJ's decision. It is clear that the ALJ was aware of and considered all of this evidence in conducting the subjective symptom analysis.

The ALJ did not overlook, but rather "acknowledge[d] and engage[d] with," the record evidence. Lothridge v. Saul, 984 F.3d 1227, 1234 (7th Cir. 2021). "Although a claimant can establish the severity of his symptoms by his own testimony, his subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record." Arnold v. Barnhart, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

The plaintiff has not demonstrated that the ALJ's consideration of the objective evidence was "patently wrong" and requires remand.

### 2.    *Daily Activities*

The plaintiff also criticizes the ALJ's consideration of his activities. Dkt. No. 12 at 13–14, 15–16. In considering whether the record supports the severity of the plaintiff's alleged symptoms, "the ALJ will look to the claimant's reported activity levels . . . ." Apke, 817 F. App'x at 257; 20 C.F.R. §404.1529(c)(3). The Seventh Circuit repeatedly has stressed the importance of using caution when considering a plaintiff's daily activities, finding, for example, that an ALJ "wrongly evaluated the significance" of a claimant's daily activities because the ALJ "failed to understand that working sporadically or performing household chores are not inconsistent with being unable to engage in substantial gainful activity." Engstrand v. Colvin, 788 F.3d 655, 661 (7th Cir. 2015) (citing Scrogham v. Colvin, 765 F.3d 685, 700 (7th Cir. 2014); Moore v. Colvin, 743 F.3d 1118, 1126 (7th Cir. 2014); Roddy v. Astrue, 705 F.3d 631, 638 (7th Cir. 2013)). But although the appellate court acknowledged that "a claimant's ability to perform daily activities does not necessarily translate into

26

an ability to work full time," the Seventh Circuit also has found that an ALJ "correctly look[s] at [a] Plaintiff's daily activities to see if they corroborated" his claims and that an ALJ sufficiently "addresse[s] this concern" in writing that, "'While . . . activities are not being compared to actual work situations, I do not consider evidence regarding the claimant's daily activities as sufficient to establish that she is unable to function at the level I have assessed.'" Deborah M., 994 F.3d at 791. See also Jeske v. Saul, 955 F.3d 583, 592–93 (7th Cir. 2020) ("[T]he ALJ considered Jeske's activities to determine whether her symptoms were as severe and limiting as she alleged. . . . This use of daily-living activities, to assess credibility and symptoms, was not improper.").

The plaintiff asserts that although the ALJ found that the plaintiff's testimony about his gun usage was inconsistent with his alleged hand limitations, "this misconstrues [his] testimony." Dkt. No. 12 at 13. The plaintiff argues that he stated that "he did not practice shooting the gun, he only did when he first got the gun to familiarize himself with the gun." Id. (citing Dkt. No. 11-17 at 60). The plaintiff asserts that he had a carrier's permit but the ALJ did not ask about how long the plaintiff had owned the gun and if he just renewed his license or recently obtained it. Id. at 13–14. The plaintiff also argues that the ALJ did not explain how owning a gun was inconsistent with Dr. Golden's restrictions to only occasional use of the plaintiff's hands and fingers. Id. at 14.

In finding that the plaintiff's subjective reports of upper extremity symptoms and limitations had been inconsistent, the ALJ noted that the

plaintiff testified at the July 2019 hearing that "he keeps a semi-automatic gun in his home for protection, for which he also has a concealed carry permit, and that he is proficient in the use of this firearm." Dkt. No. 11-15 at 17 (citing Dkt. No. 11-9 at 51–52). The ALJ stated that "[f]iring a weapon as the claimant described in his testimony is not consistent with alleged limitations in right upper extremity coordination and strength." Id. In explaining how the record reflected reports of significant continued activity, the ALJ noted again that the plaintiff "testified that he has a semi-automatic handgun for which he has a concealed carry permit" and "testified that while he does not get to practice shooting often, he is proficient in using it." Id. at 19. See also id. at 20 (noting the plaintiff's "ability to carry and operate a semi-automatic shotgun").[9]

On this point, the court agrees with the plaintiff; the court is not persuaded that the plaintiff's gun ownership indicates that the plaintiff's reported upper extremity symptoms and limitations are not as severe as alleged. The plaintiff's proficiency firing a gun has no bearing on the plaintiff's upper extremity abilities during the relevant period because there was no testimony or other indication that the plaintiff gained or worked on this proficiency during the relevant period. At the 2019 hearing, the plaintiff testified that he did not practice shooting often and did not go on a regular basis. Dkt. No. 11-9 at 52. He stated that he "did when [he] first got the gun to familiarize [himself] with the gun," but there is no indication of *when* this

---

[9] The court notes that the ALJ's decision refers to the plaintiff's gun as both a "handgun," dkt. no. 11-15 at 19, and a "shotgun," id. at 20.

occurred. Id. The plaintiff testified that he is not a hunter (which indicates he does not use the gun regularly for that purpose) and has the gun only for "house protection." Id. at 51–52. This was the extent of the plaintiff's testimony regarding the gun. Referring to the plaintiff's testimony in "July 2019," however, the ALJ's decision stated that "[f]iring a weapon as the claimant described in his testimony is not consistent with alleged limitations in right upper extremity coordination and strength." Dkt. No. 11-15 at 17. Although the ALJ did not provide a page citation, the court's review of the 2019 hearing transcript demonstrates that the plaintiff did *not* describe firing the weapon or provide any other explanation as to how he physically uses the gun. There does not appear to be any such testimony in the 2021 hearing transcript either. The court does not understand what the ALJ was referencing or where he got this information.

That said, the ALJ's consideration of the plaintiff's gun ownership as inconsistent with the extent of his alleged right upper extremity symptoms and limitations was a small part of the ALJ's subjective symptom analysis. The ALJ did not heavily rely on this activity; it was one of many activities the ALJ considered and the least referenced. The court finds this is harmless error and does not necessitate remand.

The plaintiff takes issue with the ALJ's reliance on his volunteer activities and part-time work as inconsistent with his alleged upper extremity limitations and difficulties with standing and walking. Dkt. No. 12 at 14, 15, 16. As to the plaintiff's volunteer position, the ALJ noted that the plaintiff "volunteered in

29

concessions in July and August 2014, which by his own report involved an 8-hour shift, during which he prepared foods, operated a cash register, and stood for 4 hours." Dkt. No. 11-15 at 15 (citing Dkt. No. 11-19 at 37–44). The ALJ found this inconsistent with the plaintiff's reports of his ability to stand and/or walk. Id. The ALJ similarly found that the performance of this work was "not consistent with the degree of *upper extremity* limitation alleged by the claimant or observations of treating providers as to significant limitations in upper extremity function." Dkt. No. 11-15 at 17 (emphasis added). The ALJ indicated again that the 2020 work history report described the position as involving "an 8-hour shift preparing food and operating a cash register." Id. (citing Dkt. 11-19 at 37–44). And in a paragraph generally considering how the record reflected "reports of significant continued activity," the ALJ noted again that the plaintiff was "engaged in volunteer activity (concessions) . . . during the relevant period." Id. at 19. See also id. at 20, 21 (considering the plaintiff's volunteer position in evaluating opinion evidence).

The plaintiff asserts that the ALJ omitted from the decision the fact that he volunteered for only a month, worked only one day per week, lifted and carried fewer than ten pounds and "had a sit/stand job." Dkt. No. 12 at 14, 16 (citing Dkt. Nos. 11-19 at 40; 11-15 at 15). The plaintiff argues that the ALJ did not explain "how standing for approximately four hours one day per week supports that [the plaintiff] could perform the demands of light work which requires standing and/or walking for six hours per day and five days per week." Id. at 16 (citing 20 C.F.R. §404.1567(b)). The plaintiff asserts that the

30

ALJ cannot cherry pick those facts that support his conclusion and omit those that do not. Id. (citing Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010)).

The plaintiff's 2020 work history report indicates that he worked this volunteer concession position from July of 2014 to August of 2014. Dkt. No. 11-19 at 37. The ALJ's decision explicitly stated that the plaintiff "volunteered in concessions in July and August 2014," dkt. no. 11-15 at 15, and referred to the position as "volunteer activity in the summer of 2014," id. at 17, 21. The ALJ also *did* indicate that it was a "sit/stand job," describing it as involving "4 hours of sitting and 4 hours of standing in an 8-hour shift." Id. at 21. See also id. at 15 (describing the position as involving "an 8-hour shift, during which he . . . stood for 4 hours"). The ALJ clearly was aware that the volunteer position lasted only about a month and was a "sit/stand job." And because the ALJ's decision demonstrates that the ALJ reviewed this record and was acquainted with the reported aspects of this position, there is no reason to doubt that the ALJ was aware that the plaintiff worked only one day per week and lifted/carried fewer than ten pounds. See Dkt. No. 11-19 at 40. "[A]n ALJ's adequate discussion of the issues need not contain a complete written evaluation of every piece of evidence." Pepper, 712 F.3d at 362.

As to the plaintiff's part-time job as shuttle driver, in his discussion of the plaintiff's mental impairments, the ALJ summarized the record as reflecting that the plaintiff "worked part-time (4-8 hours per day/3 days per week) as a hospital transporter/shuttle van driver from June 2018 to March 2019, which required him to write and complete reports." Dkt. No. 11-15 at 9 (citing Dkt.

31

Nos. 11-19 at 6–13, 37–44). The ALJ also found that the performance of this work was "not consistent with the degree of *upper extremity limitation* alleged by the claimant or observations of treating providers as to significant limitations in upper extremity function" because the position involved "handling, grabbing, and grasping big objects for 4 to 8 hours per shift." Id. at 17 (citing Dkt. No. 11-19 at 37–44). In evaluating Dr. Schneider's opinion, the ALJ noted that this part-time employment in 2018 and 2019 also required the plaintiff "to sit for 4 to 8 hours per shift." Id. at 21 (citing Dkt. No. Exh. 36E). See also id. at 19, 20, 21 (referring to the plaintiff's part-time work activity as a hospital shuttle van driver).

The plaintiff asserts that his part-time job as a shuttle van driver was limited to lifting and carrying fewer than ten pounds. Dkt. No. 12 at 14. The plaintiff also argues that although "he did check off to doing completing reports or performing duties like [that], no question was asked at the hearings by the ALJ as to how often the writing may have occurred or in what circumstances when evaluating past work." Id. (citing Dkt. No. 11-19 at 38). The plaintiff implies that the ALJ failed in his "duty to investigate the facts and develop the arguments both for and against granting benefits." Id. (quoting Sims v. Apfel, 530 U.S. 103, 111 (2000)). Later in the brief, the plaintiff mentions that this part-time work involved "constant sitting," which is inconsistent with the ALJ's finding that he could perform light work. Dkt. No. 12 at 26 (citing Dkt. No. 11-15 at 50–51). It is true that "the ALJ in a Social Security hearing has a duty to develop a full and fair record." Nelms v. Astrue, 553 F.3d 1093, 1098 (7th Cir.

2009) (citations omitted). But ALJs are required to make only "a 'reasonable effort' to ensure that the claimant's record contains, at a minimum, enough information to assess the claimant's RFC and to make a disability determination." Martin v. Astrue, 345 F. App'x 197, 201–02 (7th Cir. 2009) (citing 20 C.F.R. §§416.912(d), 416.927(c)(3); SSR 96–8p; Skinner v. Astrue, 478 F.3d 836, 843–44 (7th Cir. 2007)). The Seventh Circuit "generally upholds the reasoned judgment of the Commissioner on how much evidence to gather . . . [a]nd an omission is significant only if it is prejudicial." Nelms, 553 F.3d at 1098 (citations omitted). The ALJ did not make a "significant omission" requiring remand. Ferguson v. Barnhart, 67 F. App'x 360, 367 (7th Cir. 2003); Nelson v. Apfel, 131 F.3d 1228, 1235 (7th Cir. 1997). And although "the ALJ bears some responsibility for the development of the record . . . at the same time the ALJ is entitled to assume that a claimant represented by counsel is making his strongest case for benefits." Nicholson v. Astrue, 341 F. App'x 248, 253 (7th Cir. 2009) (internal quotations and citations omitted).

The plaintiff also points out that the Seventh Circuit has "cautioned ALJs not to draw conclusions about a claimant's ability to work full time based on part-time employment." Dkt. No. 12 at 14–15 (quoting Lanigan v. Berryhill, 865 F.3d 558, 565 (7th Cir. 2017); Jelinek, 662 F.3d at 812; Larson v. Astrue, 615 F.3d 744, 752 (7th Cir. 2010)). In considering the plaintiff's activities, the ALJ explicitly stated his understanding that such activities were "not indicative of

33

the capacity for full-time work."[10] Dkt. No. 11-15 at 19. The ALJ made clear that he "viewed" these activities "in conjunction with" the plaintiff's employment history, treatment, and consultative exam findings. Id.

The plaintiff argues that the ALJ also erred in relying on the fact that the plaintiff rode a bicycle. Dkt. No. 12 at 15–16, 21. In conducting the subjective symptom analysis, the ALJ included the plaintiff's bike riding in his observation that the plaintiff's treatment notes "reflect[ed] reports of significant continued activity" and provided examples. Dkt. No. 11-15 at 19. The ALJ also noted that although the plaintiff testified to significant balance issues while standing and walking, he also "reported riding a bicycle on a regular basis." Id. at 15, 20. The plaintiff asserts that riding a bicycle is a sedentary, not standing or walking, activity. Dkt. No. 12 at 15–16 (citing cases from district courts in Montana, Illinois and Indiana). The plaintiff argues that despite the ALJ's finding, he did not testify that he rode his bike on a regular basis:

> [The plaintiff] did not testify to riding his bike on a regular basis, rather, he could not sit upright on the bike; it was the type of bicycle where he would lean over the handlebars. He did it primarily to strengthen his legs and to help with balance issues. In this winter he mounted his bike and rode it. (R. 37). He did not have a gear shifter from the stem of the bike because he could not use it with his left hand. He did not have to steer the bike with only his left hand. (R. 38). He only rode twice per week for 4-5 miles.

---

[10] "[W]ithout acknowledging the differences between the demands of such activities and those of a full-time job, the ALJ [is] not entitled to use [plaintiff's] successful performance of life activities as a basis to determine that her claims of a disabling condition were not credible." Ghiselli, 837 F.3d at 777–78). This sentence in the ALJ's decision indicates that the ALJ did acknowledge these differences.

34

Id. at 16 (citing Dkt. Nos. 11-3 at 38–39; 11-15 at 63–64). Later in his brief, the plaintiff reasserts that his 2017 "testimony was that he rode his bicycle at most a little over an hour a few days per week." Id. at 21. The plaintiff argues that even if he had to "use his right side a few times" during this hour-long bike ride, "it is unclear how that transfers to the ability to frequently . . . use his hands and fingers or stand for six hours per day on a consistent basis." Id.

The ALJ noted the plaintiff's 2017 hearing testimony "that he rides his bicycle for about an hour and 15 minutes when outside, and about 45 minutes when inside." Dkt. No. 11-15 at 19; Dkt. No. 11-3 at 38–39. The plaintiff also testified that he biked "probably two or three times a week," both in the summer outside and in the winter when he mounted the bike indoors and rode it as a stationary bike. Dkt. No. 11-3 at 38. The ALJ also noted the plaintiff's 2019 hearing testimony that he still rode a bicycle and rode his bike for about 25 minutes at a time, at an average speed of about 12 miles per hour. Dkt. Nos. 11-15 at 19; 11-9 at 50–51. The ALJ also acknowledged the plaintiff's 2019 testimony regarding "the shock-absorbing features on his bicycle," that he wore a helmet and gloves and that he rides his bike indoors in the winter in a stationary position. Dkt. No. 11-15 at 19 (citing Dkt. No. 11-9 at 50–51).

The ALJ's consideration of the plaintiff's bike activity was not limited to the plaintiff's hearing testimonies; the ALJ also looked to the plaintiff's reported activity in his medical records and found that the plaintiff's "treatment notes reflect[ed] reports of significant continued activity." Dkt. No. 11-15 at 19. The ALJ pointed to "May 2015 chiropractor notes [that] indicate[d] that the

35

claimant rides his bike regularly." Id. (citing Dkt. No. 11-14 at 251). These chiropractor notes—spanning from April 22, 2015 to September 28, 2015—indicate that the plaintiff repeatedly mentioned biking. See Dkt. No. 11-14 at 250 (April 22, 2015 notes stating, "He enjoys biking a lot and that creates some back pain."), 251 (May 8, 2015 notes stating the plaintiff reported he "would like pain to go away when riding his bike as it is something he does on a regular basis and enjoys doing"), 253 (June 5, 2015 notes stating the plaintiff reported his "neck and upper back have been better after biking" and that his "low back continues to bother him and gets worse with biking or activity"), 256 (August 31, 2015 notes stating the plaintiff reported his "low back hasn't been bothering him as much after biking like it used to" and his "neck tightness has been decreasing as well, hasn't been too sore after biking"), 257 (April 22, 2015 physical exam notes including a note that the plaintiff "likes to bike a lot" and it "creates some back pain"). See also Dkt. No. 11-8 at 170 (notes from February 2016 visit indicating the plaintiff "biked during the summer, mounted during the winter"). As the plaintiff's brief states, records from a May 2015 visit to Dr. Golden noted the plaintiff's reports of riding his bike "3–4 times per week." Dkt. Nos. 12 at 6, 11-8 at 148.

The ALJ noted that the plaintiff also reported riding a bike in January 2019 and January 2020, and that he "was using a stationary bicycle in January 2020." Dkt. No. 11-15 at 19 (citing Dkt. No. 11-30 at 2). See also Dkt. No. 11-30 at 4 (stating that the plaintiff reported his headaches "seem[] to be better since adjusting the bike"); Dkt. No. 11-15 at 18 (citing this portion and

36

acknowledging that the plaintiff reported his headaches "improved with adjusting his bike and his head position while riding").

The ALJ was not inaccurate in stating that the plaintiff "has reported riding a bicycle on a regular basis." Dkt. No. 11-15 at 15. The ALJ did not err in considering the plaintiff's bike-riding activity. "An ALJ can appropriately consider a claimant's daily activities when assessing his alleged symptoms." Craft v. Astrue, 539 F.3d 668, 680 (7th Cir. 2008). See also 20 C.F.R. §404.1529(c)(3); Apke, 817 F. App'x at 257 (7th Cir. 2020) (stating "the ALJ will look to the claimant's reported activity levels"). The ALJ considered the plaintiff's bike-riding activity "as one factor—among others— . . . to determine whether [the plaintiff's] symptoms were as severe and limiting as []he alleged. . . . This use of daily-living activities, to assess credibility and symptoms, was not improper." Jeske, 955 F.3d at 592–93.

Finally, the plaintiff takes issue with the ALJ's consideration of his daily activities. Dkt. No. 12 at 19–20. The plaintiff first asserts that the ALJ based his findings "on a 2014 functional report despite this case covering over five years." Id. at 19 (citing Scrogham, 765 F.3d at 696–97, for the principle that an ALJ errs by failing "to consider the progressive nature of claimant's disease and the fact that her physical abilities might differ over time"). The plaintiff overstates the ALJ's reliance on the 2014 function report. In finding that "the nature and scope of the claimant's reported activities suggest[ed] greater physical capacity than alleged," the ALJ did start with a summary of the activities reported in the plaintiff's April 2014 function report. Dkt. No. 11-15

37

at 18–19 (citing Dkt. No. 11-7 at 19–26). This included noting that the plaintiff indicated that he "spends his day watching television and doing general household tasks (cleaning/laundry)," "tended to personal care independently with the use of his right hand; cared for his parents; cared for pets (feeding, cleaning); and prepared meals." Id. at 18. The ALJ noted that the plaintiff also reported "leaving his home 3 to 4 times weekly and being able to do so independently, traveling by walking, driving a car, riding in a car, and using public transportation," as well as shopping "in stores and by computers about 3 to 4 times per week for up to 3 hours, "visiting with others in person or on the telephone 4 to 5 times per week and regularly going to the baseball park to watch games." Id. at 18–19. The ALJ then referenced the plaintiff's January 2020 function report and acknowledged that the plaintiff "reported significantly greater limitation in daily activities," such as "relying on his wife for assistance with chores [and] his neighbors for care of his cats." Id. at 19. However, the ALJ stated that it was "difficult to attribute this to his impairments, as treatment notes fail[ed] to document a commensurate decline in function." Id.

The ALJ then turned to the plaintiff's treatment notes, which he stated "reflect[ed] reports of significant continued activity." Dkt. No. 11-15 at 19. These included the ALJ's summary of the plaintiff's reported bike-riding activity and gun ownership. Id. And the ALJ considered the plaintiff's most recent hearing testimony from December 2021, which the ALJ stated reflected continued capacity for a range of activity:

> The claimant testified that he cooks, cleans, plays chess online with another individual for about two hours per day, and takes care of

38

his parents, which involves driving 35 to 40 minutes to Pleasant Prairie once per week, staying for 2 to 3 days, providing transportation, grocery shopping, and teaching them how to use the computer to order things. Also, as noted above, the claimant engaged in volunteer activity (concessions) and part-time work activity (hospital shuttle van driver) during the relevant period.

Dkt. No. 11-15 at 19.

Despite what the plaintiff suggests, the ALJ did not rely solely on the 2014 function report and ignore evidence from the remainder of the over five-year period[11] applicable to this case.

The plaintiff points to examples of how the record shows that he is more limited in his ability to complete daily activities than the ALJ's decision noted. Dkt. No. 12 at 20. From the 2014 function report, the plaintiff points out that although he prepared his own meals, they were made in the microwave and it took him longer to make them, and that he had reported that any activity requiring physical coordination was difficult. Id. (citing Dkt. No. 11-7 at 21, 24). The plaintiff also highlights that his 2014 functional report indicated that tasks (such as personal care) "were performed with the right hand since he did not have fine dexterity with the left." Id. (citing Dkt. No. 11-7 at 20). The plaintiff points out that although his 2014 function report indicated that he went to baseball games about four to five times a week, he was an observer and this "is a seated activity." Id. (citing Dkt. No. 11-7 at 23). The plaintiff clarifies that as for the ALJ's reference to computer use and chess, the plaintiff had indicated that he used voice recognition software on his computer. Id. (citing

---

[11] An alleged onset date of October 18, 2013, and a date last insured of June 30, 2020, indicate that the relevant period is closer to seven years.

Dkt. No. 11-7 at 25). And the plaintiff emphasizes that both his 2014 function report and his 2020 function report indicated problems with lifting, squatting, bending, standing, reaching, concentrating, completing tasks or using his hands. Id. (citing Dkt. Nos. 11-7 at 24 (2014 report); 11-19 at 32 (2020 report)).

The plaintiff then cites his 2017 hearing testimony, emphasizing that he explained that in a typical day, he does not do a lot around the house. Dkt. No. 12 at 20 (citing Dkt. No. 11-3 at 39–40). The plaintiff points out that his 2020 function report reflected that "[h]is wife did a lot of the chores for him" and that he was no longer handling money. Id. (citing Dkt. No. 11-19 at 29–30). See also id. (pointing out that he testified to his wife doing a lot of the chores at the 2017 hearing, Dkt. No. 11-3 at 50). Yet the ALJ *did* mention that the plaintiff "spen[t] his day watching television," dkt. no. 11-15 at 18, and specifically observed that the plaintiff "reported significantly greater limitation in daily activities in" his 2020 function report, such as "relying on his wife for assistance with chores," id. at 19. And in noting that the 2014 function report indicated the plaintiff was able to handle money, the ALJ acknowledged that the plaintiff's "reduction in fine motor skills made it more difficult." Id. at 18–19.

The plaintiff asserts that when an ALJ analyzes "a claimant's daily activities, the analysis must 'be done with care.'" Dkt. No. 12 at 20 (citing Roddy, 705 F.3d at 639; Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012); Jelinek, 662 F.3d at 812; McKinzey v. Astrue, 641 F.3d 884, 890 (7th Cir. 2011)). The plaintiff argues that the ALJ did not explain how the plaintiff's

40

"daily activities are inconsistent with limited use for the hands and fingers, in particular on the left hand, why degenerative and residual issues had not created further limitations in standing/walking or why memory had not declined over the years as stated in the functional examinations." Id. (citing Roddy, 705 F.3d at 736). The plaintiff criticizes the ALJ for instead relying on the plaintiff's gun ownership, biking and volunteer activities. Id. at 21. As the court has explained, the ALJ was entitled to consider these activities and did nor err in his assessment. The plaintiff quotes the Seventh Circuit's instruction that "the ALJ must explain her [credibility] decision in such a way that allows [the court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." Id. at 20 (quoting McKinzey, 641 F.3d at 890). The ALJ has done so.

The ALJ is entitled and encouraged to consider "the claimant's reported activity levels," Apke, 817 F. App'x at 257, in assessing "whether [the plaintiff's] symptoms were as severe and limiting as []he alleged." Jeske, 955 F.3d at 593. See 20 C.F.R. §404.1529(c)(3). The ALJ considered all the records to which the plaintiff cites, and an "ALJ's failure to mention a few limitations on some of Plaintiff's activities, if wrong at all, [is] not so 'patently wrong' as to warrant reversal." Deborah M., 994 F.3d at 791. And although it is clear there is evidence of the plaintiff's activities both supporting and going against a finding of disability, this comes down to a disagreement with how the ALJ weighed the evidence. "Even if reasonable minds could differ on the weight the ALJ gave to" evidence in the record, the court cannot "substitute [its] judgment for that of

41

the ALJ's by reweighing the evidence." Karr v. Saul, 989 F.3d 508, 513 (7th Cir. 2021) (citing Zoch v. Saul, 981 F.3d 597, 602 (7th Cir. 2020)). As a reviewing court, this court cannot "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." Burmester, 920 F.3d at 510 (quoting Lopez, 336 F.3d at 539). See also Gedatus, 994 F.3d at 903–04 ("And true, the record contains evidence that could be construed as favorable to Gedatus. But . . . [t]his is not a case where an ALJ ignored evidence contrary to his conclusion.").

The ALJ ultimately found that "[w]hile not indicative of the capacity for full-time work, the claimant's activities demonstrate[d] that, despite experiencing symptoms of his physical impairments, he remained able to engage in a number of normal day-to-day activities, many of which involved at least a light level of exertion." Dkt. No. 11-15 at 19. The ALJ concluded that "[t]hese activities, *viewed in conjunction with* the claimant's employment history following his 1987 aneurism; routine and conservative treatment history during the relevant period; reported improvement seizures, migraines, and right-upper extremity tendinosis with treatment; and consultative examinations reflecting reasonable physical function (e.g., normal gait, muscle tone, extremity and grip strength, coordination), argue against a finding of debilitating physical impairment." Id. (emphasis added). The ALJ did "did not equate Plaintiff's activities to full-time work." Deborah M., 994 F.3d at 791.

The plaintiff has not demonstrated that the ALJ erred in his consideration of the plaintiff's activities.

### 3. *Memory and Cognitive Symptoms*

The plaintiff also argues that the ALJ erred in his subjective symptom analysis regarding the plaintiff's alleged memory and cognitive issues. Dkt. No. 12 at 21. The plaintiff asserts that although the ALJ found that the plaintiff's longitudinal history was not consistent with significant deficits in mental functioning, dkt. no. 11-15 at 9, the plaintiff "testified that he was having cognitive and mental issues after ceasing work," dkt. no. 12 at 21 (citing Dkt. No. 11-15 at 59–60). The plaintiff points to the results of a 2016 neuropsychological evaluation:

> [D]ue to memory issues observed *in DVR* and by [the plaintiff's] wife, he underwent neuropsychological testing. His supervisor had noted difficulties with comprehension in work tasks. (R. 350)(emphasis added). During the testing, [the plaintiff] struggled regarding noticing the changing of visual patterns consistent with one with righthemispheric deficiency. (R. 352). It was noted that due to his injury, his spatial awareness and attentional functioning was severely impaired; "he has difficulty seeing "the forest through the trees". This resulted in the inability to multitask. The evaluator recommended a job that utilizes solely verbal or memory related tasks, no map reading, stocking, or area that require multi-tasking. (R. 353). Moreover, [the plaintiff] should not be expected to perform a task while he was being taught how to do it. (R. 354).

Id. (citing Dkt. No. 11-8 at 82–87).

The ALJ's decision discussed this evaluation and the ALJ summarized the report in detail:

> The claimant's medical records reflect a 2016 diagnosis of "mild neurocognitive disorder due to aneurism, without behavioral disturbance" (Exh. 10F/5). The claimant was referred for neuropsychological evaluation while working with the Division of Vocational Rehabilitation (DVR) in early 2016; an employer noted he had difficulty performing work-related duties as instructed (Exhs. 10F; 11F; see also Exh. 13E). January 2016 neuropsychological testing revealed a full scale IQ falling in the average range; and

43

overall "average to slightly below average" range of cognitive functioning as compared to same age peers. Based on results of specific subtests, the evaluator noted that due to injury sustained to the right hemisphere, claimant's spatial awareness and attentional functioning was "severely impaired," affecting his ability to attend to multiple tasks at once (Exh. 10F).

Dkt. No. 11-15 at 8–9 (citing Dkt. No. 11-8 at 83–86). The ALJ referenced this report again in evaluating the four areas of mental functioning known as the paragraph B criteria. Id. at 10–11. The plaintiff also emphasizes other portions of the record that he asserts demonstrate his cognitive issues, including his 2017 hearing testimony about making mistakes during his job at the VA, dkt. no. 11-3 at 42–43, a DVR record noting that the more skilled jobs he applied for after the VA "seem[ed] pretty far off the track of where the evaluation and physical restrictions are," dkt. no. 11-7 at 51, and 2014 EEG results that were "suggestive of underlying focal neuronal dysfunction involving the left temporal region of nonspecific etiology," dkt. no. 11-8 at 186–87. Dkt. No. 12 at 21–22. None of this is persuasive, particularly the plaintiff's emphasis of the 2014 EEG results. The plaintiff cites a page from the website of New York's Mount Sinai hospital network[12] providing examples of neurologic deficits and states that "[d]eficits in this area are weakness in the arms and legs, balance and walking issues as well as memory issues, all consistent with [the plaintiff's] case." Id. at 22. The court cannot determine the relevance of this cite; among other things, there is no indication that this generic page defining "neurologic deficits" is related to "focal neuronal dysfunction involving the left temporal region" and

---

[12] See Dkt. No. 12 at 22 n.8 (citing https://www.mountsinai.org/health-library/special-topic/neurologic-deficit).

44

the plaintiff has not identified an opinion from a medical source interpreting the results of the EEG or opining as to the specific resulting impairments *the plaintiff* experiences as a result of this finding.

The plaintiff also highlights Dr. Golden's observation at an October 2019 appointment that the plaintiff did well on an "expanded mini mental exam" but "may have some residual from the AVM rupture and from his seizure disorder." Dkt. No. 12 at 22 (quoting Dkt. No. 11-36 at 5). Dr. Golden continued, noting that he would "will continue to monitor" and "consider neuropsych if symptoms progress." Dkt. No. 11-36 at 5. The ALJ discussed the neurology visits around this time:

> More recently, at February 2019 neurology visit, the claimant denied any cognitive concerns (Exh. 31F). While endorsing memory issues at an October 2019 primary care examination, the claimant did well on a Brief Interview of Mental Status (BIMS), including remembering three words without cueing (Exh. 27F/69, 76). He again endorsed memory issues at November 2019 and May 2020 neurology visits; however, he was noted to have fluent speech, intact comprehension, intact recent and remote memory, normal attention, concentration, and fund of knowledge, and intact ability to answer questions appropriately and provide details of history (Exhs. 25F/44; 29F/6). He was referred for neuropsychological testing at that time; however, he did not pursue this (Exh. 25F/44; 29F/4).

Dkt. No. 11-15 at 9.

The plaintiff also points to his 2021 hearing testimony explaining that his neurologist (Dr. Golden) had "said his prior impairments could amplify memory loss." Dkt. No. 12 at 22 (citing Dkt. No. 11-15 at 60). As the court discusses next, the plaintiff gave this testimony in response to the plaintiff's attorney's question regarding why the plaintiff did not go forward with another recommended neuropsychological exam,:

45

I have been examined a lot . . . . They've all tested me in that and basically when I spoke to my neurologist the last time I was there, she said that, you know, you're getting older. She says as people get older they lose their memory and she says with your history, with your surgeries, that that is only going to amplify it and she said that can affect your memory loss, that you probably will lose memory faster than a normal person who hadn't had your surgeries . . . .

Dkt. No. 11-15 at 60.

The ALJ's decision provided an in-depth summary of the plaintiff's medical history and the reports in the record involving his mild neurocognitive disorder and mental impairments, including in the ALJ's analysis of the four areas of functioning that make up the paragraph B criteria. Dkt. No. 11-15 at 8–12. For example, the ALJ summarized normal exam findings in April and August 2014, as well as February, October and November 2019 and May 2020. When the plaintiff reported "increasing problems with his memory" at the November 2019 visit, Dr. Schneider referred the plaintiff for neuropsychological testing. Dkt. No. 11-20 at 195, 197. At the May 2020 visit, the plaintiff reported "no other new neurologic symptoms," as well as that his "memory problems [were] stable" and that he had "decided not to have the neuropsychological testing done." Id. at 401. See also id. at 404 (Dr. Schneider's notes from that visit indicating the plaintiff "was referred for neuropsychological testing, but opted against this. He feels he is sable."). And at a December 2021 visit, Dr. Schneider noted that the plaintiff reported "memory concerns were stable" and "he continued to decline neuropsychological testing." Dkt. No. 11-48 at 82, 85.

The ALJ also evaluated opinion evidence regarding the plaintiff's mild neurocognitive disorder and resulting mental impairments. The ALJ gave

46

"substantial weight" to the March and July 2020 opinions of state agency consultants Drs. Holly and Bard. Dkt. No. 11-15 at 11 (citing Dkt. No. 11-16 at 61–72, 78–92). The ALJ noted that Drs. Holly and Bard "expressly considered the claimant's 2016 diagnosis of mild neurocognitive disorder" and "the results of neuropsychological testing against the overall evidence during the relevant period" in finding that the plaintiff "had no more than mild limitations in any domain of mental function." Id. The ALJ found that these opinions "appropriately balance[d]" and were "consistent with the overall evidence." Id. The ALJ gave "less weight" to the January 2016 opinions of Mr. Stumbras and Dr. Stanik. Dkt. No. 11-15 at 11–12 (citing Dkt. No. 11-8 at 82–87). The ALJ summarized their recommendations and found that their assessment was "based on a single battery of testing" and that although "subtesting revealed areas of weakness attributed to [the plaintiff's] history of aneurism, the overall results revealed intellectual function in the average range as compared to the general population." Id. The ALJ concluded that the opinions of Mr. Stumbras and Dr. Stanik were "not consistent with the claimant's longitudinal history, including higher education and employment history, the observations of his treating providers as to normal mental status, or his reported activities." Id.

The plaintiff does not challenge the ALJ's analysis of this opinion evidence, aside from one sentence in his reply brief stating that "Drs. Holly and Bard clearly lacked the DVR reports which corroborated issues noted in neuropsychological testing." Dkt. No. 22 at 11. The court does not consider arguments raised for the first time in a reply brief.

The plaintiff has not established the ALJ erred in evaluating the objective evidence regarding his alleged memory and cognitive impairments.

The plaintiff next criticizes the ALJ's consideration of the plaintiff's short part-time work, playing chess and caring for his elderly parents as reason "to reject any memory deficits." Dkt. No. 12 at 22 (citing Dkt. No. 11-15 at 9). The plaintiff argues that "neuropsychological testing simply showed he could not constantly multi-task" and that "he required verbal or memory related tasks and extended time to be taught how to perform a job prior to be[ing] expected to quickly perform a task." Id. (citing Dkt. No. 11-8 at 86–87). According to the plaintiff, therefore, "it is unclear how driving, playing chess with voice activation software or caring for his parents at his own time and pace are inconsistent with" such restrictions. Id. This "neuropsychological testing" refers to the assessment of Mr. Stumbras and Dr. Stanik. Dkt. No. 11-8 at 82–87. In this same report on which the plaintiff relies, Mr. Stumbras and Dr. Stanik found that the plaintiff's "*highest* areas of functioning" were "verbal comprehension and memory-related tasks." Id. at 86. The sentence the plaintiff cites recommending the plaintiff "be placed into a job that utilizes solely verbal or memory related tasks" is evidence *supporting* the ALJ's conclusion. And this evaluation notes that the plaintiff reported "some memory issues as a result of his brain surgery in 1987," but stated "that these issues are minor." Id. at 83. And as the court mentioned, the ALJ found Mr. Stumbras and Dr. Stanik's assessment and opinions warranted "less weight" than the opinions of Drs. Holly and Bard. Dkt. No. 11-15 at 11–12.

48

Finally, the plaintiff argues it is significant that the ALJ who authored the previous decision included in the RFC that the plaintiff "could perform work that utilized verbal or memory-related tasks, was concrete, focused and had a specific job demand and could not perform work that required map reading, stocking or multi-tasking." Dkt. No. 12 at 22 (citing Dkt. No. 11-9 at 10). The plaintiff points out that this decision was remanded and argues that, rather than "analyzing the opinion," "this new ALJ has simply rejected the prior RFC determination." Id. (citing Dkt. No. 11-10 at 22). However, as the Commissioner points out, that prior decision was vacated by the Appeals Council,[13] dkt. no. 11-10 at 22, and the ALJ (a new ALJ) is not bound by it. Dkt. No. 19 at 17. In his reply brief, the plaintiff argues that "this case was never remanded previously from the Court to reassess Step Two and the prior ALJ found cognitive issues to be severe." Dkt. No. 22 at 9. Again, it is irrelevant what the prior ALJ found. And this case was not remanded for reassessment of Step Two because that is not a reason to remand; "even if there were a mistake at Step 2, it does not matter." Arnett, 676 F.3d at 591. The Seventh Circuit has explained that "Step two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless." Ray v. Berryhill, 915 F.3d 486, 492 (7th Cir. 2019) (citing Arnett, 676 F.3d at 591).

---

[13] The court notes that although the plaintiff refers to ALJ Malloy's *2019* decision, dkt. no. 11-9 at 10, both the plaintiff and the Commissioner cite to the Appeals Council's *2019* order vacating and remanding ALJ Mueller's *2017* decision. See Dkt. No. 11-10 at 22–23. The Appeals Council's *2021* order vacating ALJ Malloy's 2019 decision, the decision immediately preceding the instant decision, is at Dkt. No. 11-16 at 57.

49

The ALJ found that the plaintiff's "history of 1987 aneurism, status post craniotomy; seizure disorder; and migraines" were severe impairments and continued with the analysis. Dkt. No. 11-15 at 8.

The plaintiff's reply brief appears to add an argument that the ALJ erred in his consideration of the paragraph B criteria and in finding that the plaintiff's mental impairments were non-severe, as well as failing to account for the plaintiff's "'mild' restrictions in many of the 'B' criteria" in the RFC. Dkt. No. 22 at 9, 11–12. Perfunctory or undeveloped arguments, as well as arguments raised for the first time in a reply brief, are considered waived. The court will observe that, as explained, the ALJ's decision discussed the plaintiff's alleged memory issues, the medical records and the medical opinions in great detail. Dkt. No. 11-15 at 8–12. The ALJ referenced the plaintiff's complaints of difficulties related to mental impairments, such as noting that the plaintiff "testified in February 2017 that he . . . experienced memory deficits" and asserted in a January 2020 function report that his impairments "affected his ability to sit, talk, remember, understand, follow instructions, and get along with others." Dkt. No. 11-15 at 14. The ALJ's decision demonstrates that the ALJ considered all this evidence and relied on the opinions of the state agency consultants.

4. *Conclusion*

Consistent with SSR 16-3p, the ALJ's subjective symptom analysis "contain[ed] specific reasons for the weight given to the [plaintiff's] symptoms," was "consistent with and supported by the evidence, and" was "clearly

50

articulated" so the plaintiff and this court could review how the ALJ evaluated the plaintiff's symptoms. SSR 16-3p, 2017 WL 5180304, at *10. Although the plaintiff may disagree with the weight given to the evidence, this is not a cause for remand; sitting in an appellate capacity, this court cannot "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." Burmester, 920 F.3d at 510 (quoting Lopez, 336 F.3d at 539).

In reviewing an ALJ's subjective symptom analysis, the court's role is to "merely examine whether the ALJ's determination was reasoned and supported." Elder, 529 F.3d at 413 (citations omitted). "It is only when the ALJ's determination lacks any explanation or support that [the court] will declare it to be 'patently wrong' . . . and deserving of reversal." Id. at 413–14 (cleaned up). The plaintiff has not shown that the ALJ "relie[d] on inferences that [were] not logically based on specific findings and evidence," Cullinan, 878 F.3d at 603, such that the ALJ's subjective symptom analysis was "patently wrong" and requires remand.

B.    ALJ's Evaluation of Opinion Evidence

Second, the plaintiff argues that the ALJ erred in evaluating the opinion evidence. Dkt. No. 12 at 23–28. The court first notes that both the plaintiff and the Commissioner operate under the assumption that the regulations governing claims filed *before* March 27, 2017 apply. See Dkt. Nos. 12 at 23 n.9; 19 at 18. As mentioned, the plaintiff filed his original Title II claim on February 24, 2014, and filed a subsequent Title II claim on November 4, 2019. On June

51

24, 2021, the Appeals Council directed the ALJ to consolidate the claims, dkt. no. 11-16 at 57, which the ALJ did in his February 2022 decision, dkt. no. 11-15 at 5. As the Appeals Council noted in its instructions, the prior rules apply to the consolidated case because the subsequent application was filed *after* March 27, 2017, but the initial case was filed *before* March 27, 2017. Dkt. No. 11-16 at 57 (citing HALLEX I-5-3-30). See HALLEX I-5-3-30 ("If the subsequent application(s) is filed on or after March 27, 2017 and the pending application(s) is filed before March 27, 2017, adjudicators will apply the prior rules to the consolidated case.").[14]

For claims filed before March 27, 2017, the rules in 20 C.F.R. §404.1527 apply to an ALJ's evaluation of opinion evidence. Those rules include the "treating physician rule," which states that ALJs generally will give more weight to medical opinions from the claimant's treating sources. 20 C.F.R. §404.1527(c)(2). The regulation defines a "treating source" as the claimant's "own acceptable medical source who provides . . . or has provided" the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with" the claimant. 20 C.F.R. §404.1527(a)(2). According to the regulation, an ALJ will give "a treating source's medical opinion on the issue(s) of the nature and severity of" a claimant's impairment(s) controlling weight *if* the ALJ finds that the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R.

---

[14] Available at https://www.ssa.gov/OP_Home/hallex/I-05/I-5-3-30.html.

§404.1527(c)(2). <u>See also</u> <u>Gerstner v. Berryhill</u>, 879 F.3d 257, 261 (7th Cir. 2018) (same). When an ALJ does "not give the treating source's medical opinion controlling weight," the ALJ will apply a set of factors to determine the weight to give a medical opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) any other factors that tend to support or contradict the medical opinion. 20 C.F.R. §404.1527(c)(2)(i)–(ii), (c)(3)–(c)(6). <u>See also</u> <u>Gerstner</u>, 879 F.3d at 263 (same).

The plaintiff asserts that the ALJ erred in his evaluations of all the opinion evidence: the state agency consultants (2014/2015 and 2020), Dr. Schneider, Dr. Golden and the DVR counselor's 2016 vocational assessment.

> 1. *The State Agency Consultants*

The plaintiff first addresses the ALJ's evaluation of the opinions of the state agency consultants. Dkt. No. 12 at 24–25. The plaintiff asserts that the ALJ erred in assigning "partial weight" to the 2014 and 2015 opinions of state agency consultants Drs. Gawo and Chan limiting the plaintiff to light work. Dkt. No. 12 at 24 (citing Dkt. No. 11-15 at 20); Dkt. No. 22 at 5. The plaintiff asserts that Drs. Gawo and Chan "lacked evidence of tandem walking, ataxia, cranial nerve palsies and a positive Romberg test, mildly hemiplegic gait" and his inability to walk on his heels and toes, which all "negat[e] a finding of light work." Dkt. No. 12 at 24 (citing Dkt. Nos. 11-8 at 44–45, 64, 80, 160–61, 204–06; 11-14 at 116, 182; 11-20 at 303; 11-44 at 2). The plaintiff asserts that Drs. Gawo and Chan also did not have evidence available to them at the time that

demonstrated the plaintiff's upper extremity impairments. Id. (citing Dkt. Nos. 11-8 at 9, 22, 44–45, 204–06; 11-14 at 5, 116, 167, 182; 11-20 at 62, 303, 365; 11-48 at 42–46). See also Dkt. No. 22 at 5 (same argument in plaintiff's reply brief). The plaintiff quotes Seventh Circuit case law instructing that ALJs may not "play doctor and interpret new and potentially decisive medical evidence without medical scrutiny," but does not explain how the ALJ impermissibly "played doctor." Dkt. No. 12 at 24–25 (citations omitted).

The ALJ afforded only "partial weight" to the October 2014 and June 2015 opinions of Drs. Gawo and Chan, who both limited the plaintiff to light work. Dkt. No. 11-15 at 20 (citing Dkt. No. 11-4 at 2–28). The ALJ incorporated the opinions of Drs. Gawo and Chan in the RFC only "to the extent [they were] consistent with the overall evidence," noting that their assessments that the plaintiff has the "ability to perform light work [are] consistent with the overall evidence." Id. Earlier in the decision, the ALJ summarized this evidence in detail and cited to the records that the plaintiff asserts Drs. Gawo and Chan did not have/consider. See id. at 15–17. Remand is not required as to the ALJ's assessment of Drs. Gawo and Chan's opinions.

The ALJ afforded "significant weight" to the more recent July and October 2020 opinions of state agency consultants Drs. Young and Khorshidi, who also opined that the plaintiff retained the physical capacity for light work. Dkt. No. 11-15 at 20 (citing Dkt. No. 11-16 at 61–72, 78–92). The ALJ observed

54

that Drs. Young and Khorshidi[15] "had the opportunity to review much of the claimant's treatment history for the relevant period." Id. The plaintiff asserts that this is incorrect and argues that Drs. Young and Khorshidi reviewed records only from 2019 and 2020, thus "eliminating years of treatment from consideration." Dkt. No. 12 at 25 (citing Dkt. No. 11-16 at 89–90). See also Dkt. No. 22 at 4–5 (plaintiff's reply brief). Specifically, the plaintiff asserts that Drs. Young and Khorshidi did not have access to the 2014 and 2015 consultative exams or the opinions of Dr. Golden. Dkt. No. 12 at 25 (citing Dkt. No. 11-16 at 81–91). But the plaintiff does not explain why this is important or *how* Drs. Young and Khorshidi's opinions would have changed if they had reviewed these records. As the court will explain in further detail, the ALJ found that Dr. Golden's assessment "warrant[ed] limited weight" and that the overall evidence did not support limitations to the degree opined by Dr. Golden. Dkt. No. 11-15 at 22. And notably, as the court previously addressed, the plaintiff's brief earlier argued that the 2014 and 2015 consultative exams were "problematic" and criticized the ALJ for relying on them. Dkt. No. 12 at 13. See also Dkt. No. 22 at 6–7 (plaintiff's reply brief again arguing that the 2014 and 2015 consultative exams are problematic); 12 at 26 (same). It is not clear how the plaintiff concludes that reliance on the consultative exams would change Drs. Young and Khorshidi's opinions in his favor, but also argues that these consultative exams are problematic and the ALJ should not have relied on

---

[15] The ALJ's decision says "Drs. Young and *Chan*" rather than Khorshidi, but given the context, the court believes this to be a typo. See Dkt. No. 11-15 at 20.

55

them. And finally, the ALJ conducted his own review of the record evidence and explained in detail how Drs. Young and Khorshidi's assessments were "largely consistent with the overall evidence and appropriately balance[d]" the plaintiff's subjective reports and the objective findings:

> Further, their assessment is largely consistent with the overall evidence and appropriately balances the claimant's subjective reports and intermittent clinical findings of more than mild abnormalities with clinical findings of no more than mild strength deficits, intact or reasonable coordination, and at most mildly abnormal gait without the use of an assistive device despite alleging significant balance problems; reported improvement in seizure activity and migraines with treatment; and various reported activities, which have included the ability to carry and operate a semi-automatic shotgun; ride a bicycle on a regular basis; tend to household chores (laundry/cleaning); care for his parents (cooking, cleaning, shopping, transporting); and engage in volunteer activity and part-time employment.

Dkt. No. 11-15 at 20. In fact, based on his "consideration of the overall evidence, including subjective reports of upper extremity issues, intermittent findings of mild deficits in upper extremity strength, and history of seizure treatment," the ALJ found it appropriate to provide for *greater* limitations, including postural and environmental limitations, than those imposed by Drs. Young and Khorshidi. Id.

The plaintiff's biggest critique is that the ALJ impermissibly interpreted medical records himself and "played doctor" in evaluating the opinions of the state agency consultants because these consultants lacked certain evidence in the record. See Dkt. Nos. 12 at 24–25, 22 at 4–5. However, "[a]n ALJ has 'final responsibility' for determining a claimant's residual functional capacity . . . ." Fanta, 848 F. App'x at 658 (citing 20 C.F.R. §404.1527(d)(2); Schmidt v.

56

Astrue, 496 F.3d 833, 845 (7th Cir. 2007)). The Seventh Circuit has considered the assertion that an "ALJ 'played doctor' by basing the [RFC] assessment on her own interpretation of medical evidence" and found this argument "meritless." Fanta, 848 F. App'x at 658. Cases in which the Seventh Circuit has found "that an ALJ 'played doctor' are ones in which the ALJ ignored relevant evidence and substituted her own judgment." Olsen v. Colvin, 551 F. App'x 868, 874–75 (7th Cir. 2014). That did not occur here.

The plaintiff has not shown that the ALJ erred in his evaluation of the state agency consultants' opinions.[16]

### 2. *Dr. Schneider*

The plaintiff argues that the ALJ erred in giving "little weight" to Dr. Schneider's opinions because there is evidence in the record supporting Dr. Schneider's sitting and standing restrictions. Dkt. No. 12 at 25–26 (citing Dkt. Nos. 11-8 at 9, 19, 22, 24, 45, 64, 161, 205–06; 11-14 at 116, 182; 11-20 at 303; 11-44 at 2). The plaintiff asserts that these objective examination findings support restricting the plaintiff to sedentary work with additional upper extremity limitations, including "a reduction in his ability to use his hands and fingers." Id. at 26 (citing 20 C.F.R. §404.1527(c)(3)). The plaintiff argues that "[a]n inadequate evaluation of a treating physician's opinion requires remand."

---

[16] The plaintiff's reply brief adds an assertion that the ALJ relied on the 2014, 2015 and 2020 state agency consultant opinions to support the RFC, but omitted "consideration for what evidence the doctors lacked as required by 20 C.F.R. §404.1527(c)(3)." Dkt. No. 22 at 5. However, the regulations explain how ALJs consider evidence from federal or state agency medical or psychological consultants in subsection (e), not (c)(3). 20 C.F.R. §404.1527(e). Subsection (e) cross-references the rules in §404.1513a.

57

Id. (quoting Cullinan, 878 F.3d at 605; Meuser v. Colvin, 838 F.3d 905, 912 (7th Cir. 2016); Scott v. Astrue, 647 F.3d 734, 739–40 (7th Cir. 2011)).

The ALJ gave "little weight to the opinions of Dr. Janel Schneider as set forth in a seizure questionnaire dated January 16, 2015." Dkt. No. 11-15 at 21 (citing Dkt. Nos. 11-8 at 74–77; 11-48 at 36–40). The ALJ first addressed Dr. Schneider's assessment that after the plaintiff has a seizure, he will need to rest and be "sedentary for one day." Id. The ALJ observed that "the record reflects that the [plaintiff] has been seizure-free with use of lamotrigine since 2014," id., which Dr. Schneider's report also indicated with a note that "with recent medication, reports seizure free since October 2014," dkt. no. 11-8 at 74. See also Dkt. Nos. 11-8 at 204 (notes from July 2016 visit that the plaintiff "continues to be free of any episodes concerning for seizure activity on the low dose of lamotrigine"); 11-14 (notes stating the plaintiff mentioned weekly episodes concerning epileptic seizures in February 2014, but reported being stable in January 2017 and continuing to be free of any episodes of seizure activity at the January 2018 visit); 11-44 at 2 (note from Dr. Schneider's February 2019 exam that plaintiff is still "doing well on low dose lamotrigine"); 11-48 at 82–85 (notes from December 2021 visit indicating he "continues to be seizure-free on lamotrigine"). The ALJ nevertheless purported to accommodate "the potential for breakthrough seizure activity" by imposing postural and environmental limitations in the RFC, dkt. no. 11-15 at 21, such as a restriction that the plaintiff could "never climb ladders, ropes, and scaffolds"

58

and "must avoid all exposure to unprotected heights, hazards, and use of dangerous moving machinery," id. at 13.

The ALJ next addressed Dr. Schneider's opinion "that due to 'underlying deficits from previous aneurysm,' the [plaintiff] would be limited to low stress work, could sit for about two hours in an eight-hour day, stand/walk for less than two hours in an eight-hour day, and never lift any weight." Dkt. No. 11-15 at 21; Dkt. No. 11-8 at 75–76. The ALJ found that "[t]his degree of limitation assessed by Dr. Schneider [was] not consistent with the overall evidence" and provided a detailed explanation:

> This degree of limitation assessed by Dr. Schneider is not consistent with the overall evidence, including clinical findings of normal muscle tone, largely mild deficits in strength and gait, and no evidence as to fall or use of an assistive device, despite intermittent positive Romberg test and inability to tandem walk or walk on toes and heels. Further, while the claimant has reported episodes of right upper extremity symptoms, the record reflects a diagnosis of tendinosis, improvement with occupational therapy, and that the claimant declined further treatment measures (Exh. 1F). Moreover, at an April 2014 consultative medical examination, the claimant had full bilateral upper extremity strength, including grip strength, and was [able] to perform finger-to-nose with rapid alternating movements, and at a May 2015 consultative medical examination, the claimant denied right-handed symptoms and reported only "some" leftsided weakness (Exhibit 3F; 8F). As discussed above, these examinations failed to reveal any significant deficits in physical function. Finally, the record reflects that the claimant has engaged in volunteering and part-time work activity requiring exertional activity in excess of these limitations (see Exh. 36E). For example, he reported that his volunteer activity in the summer of 2014 involved 4 hours of sitting and 4 hours of standing in an 8-hour shift and part-time employment in 2018 to 2019 requiring him to sit for 4 to 8 hours per shift (Exh. 36E).

Dkt. No. 11-15 at 21 (citing Dkt. Nos. 11-8 at 2–47, 59–61, 78–80; 11-19 at 37–44). The ALJ also found it notable that in July of 2019, Dr. Schneider

"expressly acknowledged her limitations in providing specific documentation as to the [plaintiff's] physical limitations." Id. (citing Dkt. No. 11-20 at 243).

The plaintiff argues that, contrary to the ALJ's decision, nothing about Dr. Schneider's opinion was inconsistent because portions of the record support Dr. Schneider's assessment. Dkt. Nos. 12 at 25–26; 22 at 12 (reply brief adding citations to Dkt. Nos. 11-8 at 78; 11-14 at 2; 11-15 at 58–59; 11-20 at 365; 11-48 at 10, 13, 42, 85). The plaintiff again attacks the ALJ's citation to the 2014 and 2015 consultative exams, arguing "there is an internal inconsistency between" them: "The 2014 CE makes no reference to left-sided hemiplegia despite the remainder of the record and no gait issues despite the abovementioned. The 2015 CE does not test upper extremity issues but confirms gait deficits." Dkt. No. 12 at 26. It is not clear how these arguments demonstrate error in the ALJ's reference to the consultative exams in evaluating Dr. Schneider's opinion. As the ALJ observed, the objective findings of the 2014 exam noted that the plaintiff was able to perform the "finger-to-nose [test] with rapid alternating movements" and that the plaintiff's "grasp strength [was] 5/5 bilaterally." Dkt. No. 11-8 at 60. The examiner's notes also stated that although the plaintiff reported having problems at times with his right hand "performing fine and dexterous movements," it "was not noted on [that] date." Id. As to the 2015 exam, the plaintiff's assertion that the purpose of the exam was to assess his gait issues and not his upper extremities is irrelevant to the ALJ's observation that on that date, the plaintiff reported "some weakness in the left hand" and "no problems in the right hand." Id. at

60

78. Finally, the plaintiff disputes the ALJ's finding that the plaintiff "engaged in volunteering and part-time work activity requiring exertional activity in excess of these limitations" imposed by Dr. Schneider. Dkt. No. 11-15 at 21 (citing Dkt. No. 11-19 at 37–44). The plaintiff reiterates that his volunteer activity was only "one day per week and lasted at most one month," and that his part-time employment involved "constant sitting," which he asserts is "inconsistent with the ALJ's finding of light work and he would take breaks as he needed." Dkt. No. 12 at 26 (citing Dkt. Nos. 11-19 at 40; 11-15 at 50–51). As the court has concluded, the ALJ did not err in his consideration of the plaintiff's reported activities.

An ALJ will give a treating doctor's opinion controlling weight only if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and *is not inconsistent with the other substantial evidence in [the] case record.*" 20 C.F.R. §404.1527(c)(2) (emphasis added). See also Cullinan, 878 F.3d at 605 ("A treating doctor's opinion is entitled to controlling weight unless it is unsupported by the record."). The ALJ *did* consider the records that the plaintiff highlights as supporting Dr. Schneider's opinion, dkt. no. 11-15 at 14–18, but also summarized the other evidence in the record that was not consistent with the limitations opined by Dr. Schneider. See id. at 21 (stating the "degree of limitation assessed by Dr. Schneider [was] not consistent with the overall evidence" and summarizing that evidence). The court cannot reconsider facts, reweigh the evidence or resolve conflicts in evidence. Burmester, 920 F.3d at 510; White v. Barnhart, 415 F.3d 654, 659 (7th Cir.

61

2005). Courts "do not review medical opinions independently but rather review the ALJ's weighing of those opinions for substantial evidence, and [courts] only overturn that weighing if no reasonable mind could accept the ALJ's conclusion." Grotts v. Kijakazi, 27 F.4th 1273, 1278 (7th Cir. 2022). And "substantial evidence" is not a high bar; it "means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Jozefyk v. Berryhill, 923 F.3d 492, 496 (7th Cir. 2019) (quoting Moore, 743 F.3d at 1120–21). The ALJ did not err in his assessment of Dr. Schneider's opinion.

### 3. *Dr. Golden*

The plaintiff argues that the ALJ "failed to offer good reasons for" rejecting the assessments and opinions of his primary care provider, Dr. Golden. Dkt. No. 12 at 27. The plaintiff asserts that the ALJ suggested that the primary care visits were normal, but ignored the fact that these appointments were "related to well man visits, general health concerns, weight loss, HAs and medication." Id. (citing Dkt. Nos. 11-8 at 26–31, 131, 148, 219, 232; 11-14 at 103, 128; 11-15 at 16). The plaintiff contends that "most significantly," the ALJ "emphasizes these records" over "a long list of records documenting upper and lower extremity deficits." Id. (citing Dkt. Nos. 11-8 at 9–10, 22, 44–45, 59, 64, 80, 85, 159–60, 204–06; 11-14 at 116, 167, 182; 11-20 at 303; 11-44 at 2). For example, the plaintiff highlights records showing "slight shaking," "mild tremulousness" in the left hand, "significant" restrictions to the left hand and a positive Romberg on examination. Id. (citing Dkt. Nos. 11-14 at 166; 11-44 at 2). The plaintiff reiterates his criticism of the ALJ's reference to the 2014 and

2015 consultative exams for the same reasons previously asserted. The plaintiff points out that "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." Id. (quoting Denton, 596 F.3d at 425).

In evaluating the opinion evidence, the ALJ's lengthiest discussion was of Dr. Golden's assessments and he afforded them "limited weight." Dkt. No. 11-15 at 21–22. The ALJ first summarized Dr. Golden's findings and opinions from November 2015, April 2019 and February 2021:

> Dr. Golden indicated that as a result of his aneurism, the claimant has weakness to his right upper extremity, residual back pain, and left lower extremity weakness and neuropathy. She opined that due to these conditions, the claimant would be limited to sitting for eight hours at a time, standing for two hours at a time, lifting no more than ten pounds, and restricted from repetitive movement with his right arm and hand (Exhibit 9F). She additionally opined that he could occasionally twist, bend, and reach; and never/rarely squat or climb. Dr. Golden provided an updated statement regarding the claimant's physical functioning, dated April 2, 2019, citing the claimant's history of aneurism and seizure disorder and associated symptoms of weakness, numbness, and chronic pain in the upper extremities, right worse than left, and difficulty with fine motor skills (Exh. 16F; see also Exh. 37F). She confirmed this opinion in February 2021, noting the claimant's limitations began in October 2013 when the claimant became "disabled" (Exh. 33F). Dr. Golden opined that due to history of seizures, the claimant would be off-task up to 15% of an eight-hour workday, and that he was limited to low stress work due to easy frustration. However, as noted above, the record reflects that the claimant's seizures have been well-controlled since 2014. Dr. Golden further opined that he could walk more than ten blocks without rest or severe pain; sit more than two hours at a time, and at least six hours total in an eight-hour day; stand more than two hours at a time, and stand/walk for about two hours total in an eight-hour day; and lift and carry up to 10 pounds occasionally and up to 20 pounds rarely. Dr. Golden opined that the claimant could use his bilateral hands for grasping, turning, twisting, and fine manipulation for up to 20% of an eight-hour day;

63

and reach bilaterally for 50% of an eight-hour day. Dr. Golden further opined that the claimant would require a job that allowed him to alternate positions at will, and that he would require unscheduled breaks 1 -2 times per day.

Dkt. No. 11-15 at 21–22 (citing Dkt. Nos. 11-8 at 81; 11-14 at 2–6; 11-48 at 9–14, 41–46).

In finding that Dr. Golden's assessments warranted limited weight, the ALJ stated that the record failed "to document significant, ongoing complaints, treatment, or functional limitations associated with back pain." Id. at 22. Regarding the plaintiff's upper extremities, the ALJ found that the record reflected that the plaintiff's "right-hand symptoms were episodic, associated with tendinosis, and improved with occupational therapy/home exercise," noting that the plaintiff "declined additional treatment offered, including steroid injection and splinting." Id. (citing Dkt. No. 11-8 at 2–47, 59–61, 78–80). The ALJ also observed that although the plaintiff's "treating providers have noted deficits in left-sided strength and coordination, these were found to be mild by the consultative medical examiners." Id. (citing Dkt. No. 11-8 at 59–61, 78–80). The ALJ found it significant that the plaintiff's "primary care examinations noted no musculoskeletal or neurological abnormalities in April 2014, May 2015, August 2016, January 2017, and March 2018, including as to motor strength, coordination, or gait." Id. (citing Dkt. No. 11-8 at 130–31, 150, 218, 231; 11-14 at 102, 128). And the ALJ acknowledged that although "Dr. Golden noted in January 2019 that the [plaintiff's] left-sided upper and lower extremity strength was slightly reduced to 4/5, as compared to the right, she characterized the [plaintiff's] left-side muscle strength as 'okay.'" Id. (citing

64

Dkt. No. 11-14 at 166–67). In sum, the ALJ concluded that although the overall evidence supported a finding of limitations associated with the plaintiff's physical impairments, the record was "not consistent with the degree assessed by Dr. Golden in November 2015." Id.

Contrary to the plaintiff's assertions, the ALJ did consider the "records documenting upper and lower extremity deficits" that the plaintiff highlights, both in evaluating the opinion evidence and earlier in the decision. See Dkt. No. 11-15 at 14–17. For example, in discussing and summarizing the plaintiff's medical history and the evidence in the record, the ALJ noted that a November 25, 2015 primary care visit found "weakness of the right forearm, as well as with gripping, as compared to the left, and left lower extremity 3-4/5 strength." Id. at 16 (citing Dkt. No. 11-8 at 160–61). The ALJ also acknowledged that "February 2019 neurology notes document[ed] mild tremulousness of the left hand with significantly impaired fine finger movements, but muscle tone and strength (5/5) in all extremities." Id. at 17 (citing Dkt. No. 11-44 at 2). And the ALJ noted the "findings of decreased upper extremity strength of 3/5 on the right and 4/5 on the left" at a January 2020 visit. Id. (citing Dkt. No. 11-30 at 5). See also id. at 15 (noting a May 2015 consultative medical exam was "remarkable for spasm and tenderness in the lumbar paraspinal muscles with limited range of movement" and that neurology exams in 2016, 2019 and 2020 "have noted some issues with balance and gait"), 16 (noting September and December 2013 exams showed "tenderness at the right thumb with range of motion, as well as pain with supination and pronation of the right hand" and

65

"decreased (4/5) left upper and lower extremity strength with active testing, weakened right hand grip, and pain with supination and pronation of the right hand," as well as noting "diminished right upper extremity strength, slower finger-to-nose testing and five-point touch" in February 2014). In summarizing the plaintiff's left-sided hemiparesis, the ALJ found that "treatment notes document[ed] varying degrees of deficits in upper extremity strength and coordination, left lower extremity strength, and gait with April 2014 and May 2015 consultative medical examinations noting at most mild finding and treatment notes documenting intermittent abnormalities in strength, coordination, and balance." Id. at 18. The ALJ concluded that the plaintiff "undoubtedly experiences limitations due to his physical impairments" and crafted an RFC that he felt adequately accommodated these limitations. Id.

The court cannot agree that the ALJ improperly "cherry-picked" facts or ignored lines of evidence in assessing Dr. Golden's opinions. The ALJ sufficiently "acknowledge[d] and engage[d] with" the record evidence, Lothridge, 984 F.3d at 1234, and although "an ALJ must consider the entire record . . . the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians." Schmidt, 496 F.3d at 845 (citing Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1995)). And again, "[e]ven if reasonable minds could differ on the weight the ALJ gave to the medical evidence," the court cannot "substitute [its] judgment for that of the ALJ's by reweighing the evidence." Karr, 989 F.3d at 513 (citing Zoch, 981 F.3d at 602). See also Burmester, 920 F.3d at 510 (indicating this court cannot

66

reconsider facts, reweigh the evidence or resolve conflicts in evidence). Courts "do not review medical opinions independently but rather review the ALJ's weighing of those opinions for substantial evidence, and [courts] only overturn that weighing if no reasonable mind could accept the ALJ's conclusion." Grotts, 27 F.4th at 1278.

The plaintiff has not demonstrated that the ALJ erred in assessing Dr. Golden's opinions and the court will not remand on that ground.

### 4.    *Vocational Assessment*

Finally, the plaintiff argues that the ALJ erred by finding that the 2016 vocational assessment was not persuasive. Dkt. No. 12 at 28. The ALJ indicated that he considered the March 2016 vocational assessment completed by DVR counselor Carol Heller. Dkt. No. 11-15 at 22 (citing Dkt. No. 11-8 at 106–11). The regulations do not include a DVR counselor as an "acceptable medical source." See 20 C.F.R. §404.1502(a). The regulations instruct that ALJs "will consider these opinions using the same factors as listed in paragraph (c)(1) through (c)(6)," but clarify that "not every factor . . . will apply in every case because" evaluating a non-acceptable medical source or a non-medical source "depends on the particular facts in each case." 20 C.F.R. §404.1527(f)(1). As for the articulation requirement, the regulations indicate that the ALJ "generally should explain the weight given to opinions from these sources or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow

67

the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." Id. at §404.1527(f)(2).

The ALJ found that to the extent the vocational assessment addressed the plaintiff's physical limitations, it warranted "little weight" because it "appear[ed] to be based on Dr. Golden's November 2015 opinion, addressed above, and d[id] not reflect an independent assessment." Dkt. No. 11-15 at 22. The ALJ then concluded that "[a]s to the results of standardized testing of achievement and aptitude administered, the report fail[ed] to provide a function-by-function analysis as to the claimant's mental function." Id. And the ALJ noted that the reported failed "to identify Ms. Heller's credentials and lack[ed] an anticipated signature by vocational specialist, Deborah Thompson, MS, PVE." Id. See Dkt. No. 11-8 at 111.

The plaintiff argues that the top of the assessment "explains that the report [was] based on 2016 meetings." Dkt. No. 12 at 28. This seems to refer to the 3/9, 3/16, 3/28 and 3/31/16 evaluation dates at the top of the report. Dkt. No. 11-8 at 106. As best the court can tell, these evaluation dates are the dates of the vocational interest surveys and achievement and aptitude tests administered to the plaintiff. Id. at 106–08. The ALJ's statement that the report appeared to be based on Dr. Golden's 2015 opinion referred to the report's summary of the plaintiff's physical limitations, id., which it included as "background information," dkt. no. 11-8 at 106. These "permanent restrictions" listed in the vocational report mirror those opined in Dr. Golden's work status report. See Dkt. No. 11-8 at 106, 81. The ALJ's statement that the DVR

68

counselor did not conduct an independent assessment of the plaintiff's physical limitations was not wrong, and the ALJ sufficiently explained why he found Dr. Golden's opinions not persuasive.

The ALJ criticized the portion of the report involving "the results of standardized testing of achievement and aptitude administered" by the DVR counselor as "fail[ing] to provide a function-by-function analysis as to the claimant's mental function." Dkt. No. 11-15 at 22. The plaintiff asserts that this is incorrect because the report did offer a function-by-function assessment: "In particular: sedentary work, occasional bending, twisting and reaching, never to squat or climb and right hand restricted from repetitive movements." Dkt. No. 12 at 28 (citing Dkt. No. 11-8 at 109). The plaintiff also argues that the report indicated that the plaintiff "could perform work if he had specialized software so he did not have to use his hands." Id. (citing Dkt. No. 11-8 at 106–11). This argument overlooks the fact that the ALJ stated that the report did not "provide a function-by-function analysis as to the claimant's *mental* function." Dkt. No. 11-15 at 22 (emphasis added). When this fact was pointed out by the Commissioner, the plaintiff did not dispute that the report did not provide this, stating that "[t]here was no memory assessment." Dkt. No. 22 at 13.

Instead, the plaintiff reasserts his final argument that the ALJ overlooked the fact that the vocational assessment report referred to the plaintiff's issues with memory loss:

> Moreover, the ALJ overlooked that [the plaintiff] had participated in job placement. The assessment explained that when he was placed

at Zablocki Veterans Hospital he was observed to have problems with memory loss affecting his ability to focus or complete tasks. (R. 377). It was stated "steven would be assigned a project, but after a while he would not recall the project, or where he was in the project". (R. 377). The ALJ fails to explain how this was accounted for in the RFC or why it was rejected.

Dkt. No. 12 at 28 (citing Dkt. No. 11-8 at 110). See also Dkt. No. 22 at 13–14 (reply brief). This argument lacks merit.

First, the vocational assessment report referenced this information from another source; it did not indicate that the DVR counselor conducted an independent assessment or testing of the plaintiff's memory. The report did not cite the source of the information and the wording implies the information was reported to the DVR counselor by the plaintiff. Dkt. No. 11-8 at 110. The report itself indicates that it cannot opine on the plaintiff's memory loss, but rather recommends additional testing: "perhaps more testing for memory loss may be needed to determine how to provide support to Steve in the work environment," "need more information regarding technology and memory loss," "he may want to look further into this," etc. Id. at 110–11.

Second, the plaintiff's argument that the ALJ failed to explain how these memory issues were accounted for in the RFC or why they were rejected strays into arguments that the ALJ improperly determined that the plaintiff's "medically determinable mental impairment of mild neurocognitive disorder . . . was . . . nonsevere," dkt. no. 11-15 at 9, and that substantial evidence did not support the ALJ's decision to refrain from adding a limitation in the RFC regarding the plaintiff's memory issues. To the extent the plaintiff meant to argue that the ALJ erred at Step Two in finding that the plaintiff's

70

neurocognitive disorder and mental impairments were non-severe, the court will not remand on that basis. As the court noted earlier, "even if there were a mistake at Step 2, it does not matter." <u>Arnett</u>, 676 F.3d at 591. As noted, the Seventh Circuit has explained that "Step two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless." <u>Ray</u>, 915 F.3d at 492 (citing <u>Arnett</u>, 676 F.3d at 591). To the extent the plaintiff argues that the ALJ should have included a restriction in the RFC related to the plaintiff's memory impairments, the court has found that the plaintiff did not fully assert or develop this argument in his initial brief, and perfunctory or undeveloped arguments, as well as arguments raised for the first time in a reply brief, are waived.

The plaintiff has not identified any error in the ALJ's consideration of the DVR counselor's 2016 vocational assessment requiring remand.

C. <u>Addition of Argument as to Step Four Finding</u>

At the very end of the section of his brief asserting that the ALJ erred in evaluating the opinion evidence, the plaintiff appears to argue that the ALJ erred in finding that the RFC did not preclude the plaintiff from performing his past work:

> Finally, the ALJ overlooks the fact that [the plaintiff's] past relevant work as an eligibility and occupancy interviewer was an accommodated job to begin with. (R. 1059, 1093). He was hired with the understanding of having balancing issues and doing work with one hand. (R. 1093); *Cleveland v. Policy Management Systems*, 526 U.S. 795 (1999) (accommodated jobs cannot be considered). Despite clear evidence as to the accommodations in place, the ALJ has [the plaintiff] returning to the same job eliminating all accommodations. (R. 1059).

71

Dkt. No. 12 at 28–29. The Commissioner interprets this as a challenge to the ALJ's findings at Step Four. Dkt. No. 19 at 24. At Step Four, the ALJ found that "[t]hrough the date last insured, the claimant was capable of performing past relevant work as an eligibility and occupancy interviewer" because "[t]his work did not require the performance of work related activities precluded by the claimant's residual functional capacity." Dkt. No. 11-15 at 22–23.

The Commissioner nevertheless argues that the plaintiff did not "develop this argument, and has therefore waived it." Dkt. No. 19 at 24 (citing Colburn v. Trs. of Ind. Univ., 973 F.2d 581, 593 (7th Cir. 1992)). Alternatively, the Commissioner argues that any alleged error at Step Four "would be harmless because the ALJ made an alternative finding at step five that Plaintiff could perform a significant number of other jobs in the economy." Id. at 25 (citing 20 C.F.R. §404.1520(a)(4)(iv-v)).

The court agrees that these three sentences—apparently included as an afterthought—amount to a "perfunctory and undeveloped" argument that the ALJ erred at Step Four. The court also agrees that any such error is harmless because the ALJ continued with the analysis and provided an alternative finding at Step Five:

> Although the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that he is also able to perform. Therefore, the Administrative Law Judge makes the following alternative findings for step five of the sequential evaluation process.

Dkt. No. 11-15 at 23–24. The ALJ found that, "[i]n the alternative, considering the claimant's age, education, work experience, and residual functional

72

capacity, there were other jobs that existed in significant numbers in the national economy that the claimant also could have performed." Id. Specifically, the ALJ found that based on the VE's testimony, the plaintiff "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy," *i.e.*, office helper, rental clerk and mail clerk. Id. at 24. A finding at Step Four that the plaintiff was *not* capable of performing past relevant work, therefore, would not change the outcome and the ALJ's Step Five finding indicates the ALJ would still would have denied benefits on remand.

The court will not remand on this ground.

## IV. Conclusion

The court **ORDERS** that the final administrative decision of the Commissioner of Social Security, denying the plaintiff's application for disability benefits, is **AFFIRMED**.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 18th day of July, 2023.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

73